COLLINS, Appellant, vs. HOEHLE, Respondent.

*May 5 — May 24, 1898.*

*Witness, impeachment of.*

The rule that a party cannot impeach his own witness is violated by
permitting such party to read from the testimony given by such
witness in another case, and to examine him in relation thereto,
for the purpose of contradicting his testimony at the trial.

APPEAL from a judgment of the circuit court for Douglas
county: A. J. VINJE, Circuit Judge. *Reversed.*

Action for the conversion of certain personal property de-
scribed in the complaint of the alleged value of $400, being
a part of a logging and lumber camp outfit, alleged to have
been taken by the defendant by his duly-authorized agent
and deputy November 12, 1895, and converted to his own
use. The cause was tried at the August term of the circuit
court for Douglas county, but the verdict then rendered,
and the judgment entered thereon, were afterwards set aside,
and a new trial ordered, which resulted in a verdict and
judgment in favor of the defendant, from which the plaintiff
appealed.

The defendant justified the taking and conversion charged
as sheriff of Douglas county, under an execution issued upon
a judgment rendered November 9, 1895, in the municipal

court of Douglas county, in an action wherein A. T. Rock was plaintiff, and J. E. Erickson, Michael Collins, and Nettie C. Erickson, copartners as Erickson & Collins, were defendants, for the sum of $489.05 damages and $7.75 costs. Said execution was directed to the defendant, *Hoehle*, then sheriff of Douglas county, by virtue of which he levied on the goods and chattels mentioned in the complaint, and, after having advertised them for sale on execution, sold them accordingly, and paid over to A. T. Rock, the execution creditor, the sum of $146.60, being the proceeds of the sale, less $50.50, his lawful costs and disbursements. Such taking, sale, and conversion are the grounds of the plaintiff's cause of action.

The defendant alleged that the only right, title, and interest which the plaintiff claims or had to any of the goods and chattels levied on and sold was derived from and under a chattel mortgage thereon, dated May 16, 1895, purporting to have been executed by the firm of Erickson & Collins, said execution defendants, which mortgage, it is alleged, was fraudulent and void as against their creditors, particularly the said A. T. Rock, because it was executed and delivered to the plaintiff, *John Collins*, by Michael Collins, purporting to act for and on behalf of said firm of Erickson & Collins, but without the knowledge or consent of the other members of said firm, and that the said act of Michael Collins had never been ratified; that at the time said mortgage was given said firm of Erickson & Collins was hopelessly insolvent, and indebted to various parties in large amounts, which they were unable to pay — all of which the plaintiff herein, *John Collins*, well knew. It was further claimed that it had been given long after the firm of Erickson & Collins had been dissolved, and not only to secure an alleged debt of said firm to the plaintiff, but a debt of $200 owing to him by Michael Collins as well, at the request of *John Collins;* that it was given and received for the express purpose of defrauding the other member or members of said

firm of Erickson & Collins, and to hinder, delay, and defraud
the creditors of said firm, especially A. T. Rock, said execu-
tion creditor,— all of which was well known to the plaintiff,
*John Collins*, the mortgagee.

It appeared from the testimony of the deputy sheriff and
of John Collins, Jr., that the property in question was in the
possession of said John Collins, Jr., under a chattel mortgage
to *John Collins, Sr.;* that Mike Collins is the Collins that
was a member of the firm of Erickson & Collins, namely,
Mike Collins and Jake Erickson. The plaintiff testified, in
substance, that he had loaned the firm of Erickson & Col-
lins the sum of $2,000, $800 of which they had paid, and
that he loaned them $1,200 more, the firm giving him a
note, which James Collins signed, but that he did not receive
any part of the money which was actually given to Erickson
& Collins; that said firm was then indebted to various cred-
itors in considerable amounts, and did not have money to
pay their debts, and no money was coming to them unless
they could get it from Gilbert on their logging contract;
that the mortgage of July 8th was for the $1,200 note and
the $200 advanced to Mike Collins from time to time, as
stated in the testimony; that he got the mortgage from
Erickson & Collins as a company, and went right up the
same day, and put it on record; that at the time the mort-
gage was given to him he had received no payment on the
note, no part of the principal, but there was some interest
due at the time; that they were owing him other moneys at
the time; that he loaned them in the neighborhood of $200.
The note, Exhibit C, is the note which the chattel mortgage,
Exhibit A, was intended to secure. Exhibit C was then re-
ceived in evidence, as well as said Exhibit A. Considerable
evidence was produced by the defendant tending to show
that the note and mortgage under which the plaintiff claimed
title to the property in question were fraudulent and void as
against the creditors of Erickson & Collins, the mortgagors.

The plaintiff testified that he took possession of all the property under his mortgage, and claimed to hold all of it for the payment of the same. "The mortgage, I suppose, is to cover the $1,200, and the balance that was loaned afterwards. But nothing was ever said to me about giving me a $4,000 mortgage. I was never offered and never agreed to take a $4,000 mortgage. Never had a talk with Jake or Mike or anybody else about a $4,000 mortgage. All I looked for in any of my talks with Mike or Jake was to secure the payment of the debt which Erickson & Collins owed me; I didn't have any other object. I don't think I did have a talk with Mike about security before he went away. I don't remember it if I did. If I did testify that way last fall in this court, I testified to the truth certainly. I got this mortgage after Mike came back. I held this note of $1,200 and the firm owed me $200 besides. This $200 made up the borrowed money. I gave it to Mike Collins for company purposes." Thomas E. Lyons, a witness for the plaintiff, testified that some time in May, 1895, Mike Collins came to his office and directed a chattel mortgage to be drawn up for $4,000; that he drew the mortgage, and at that time two or more typewritten copies were made; that Mike took one of them away, and the other remained in the office. "In July — I think the 8th — Mike and his father came to the office, and wanted a chattel mortgage drawn up, and I took the copy which remained in the office, and made changes in the amount and the description of the note as it now stands, and it was then executed and delivered to *John Collins.*"

The defendant moved to dismiss the action, and for a nonsuit upon the whole case, and more particularly for the reason that the evidence showed that the mortgage in question was given to secure the $1,200 note, with interest reckoned at $85, and the private account of Mike Collins, aggregating $200, and that the evidence showed the mortgage to be fraudulent and void.

Michael Collins, a witness for the defendant, testified: "I was formerly a member of the firm of Erickson & Collins and signed defendant's Exhibit 6. I think it was on the 16th of May, 1895. I and Jake Erickson had some conversation, in which it was understood that this mortgage should be drawn. .Q. What was the conversation? *Mr. Lyons:* We [the plaintiff] object to any evidence as to the parties' object in the drawing of this $4,000 chattel mortgage,— conversations between Erickson and Collins in reference to it. *The Court:* It is admitted on the express statement of counsel that they will show plaintiff's connection with and knowledge of it. (Exception taken.) *Witness:* The conversation was that Erickson and I talked over our business matters, the situation of the firm, and the $1,200 that we owed my father, and came to the conclusion that we would not pay that $1,200 at that time; that we would draw up a mortgage in his favor for that $1,200 debt, but with the intention that, if we got hard up, we probably might get some money from him to help us out in the business. At that time we had lots of money coming to us to pay our debts. My father was not there when we had that talk. I did not subsequently have a talk with my father concerning the conversation or arrangements that I and Jake reached. I never had any talk with my father about that $4,000 mortgage. I was sworn on the trial of the case of Olson against Collins in the superior court. Q. I will ask you if you did not testify in that case as follows concerning your father's knowledge of this mortgage (offering to read from a transcript, defendant's Exhibit 7). (Objected to by plaintiff as incompetent, irrelevant, immaterial, and also upon the ground that the defendant cannot impeach his own witness. Objection overruled, and exception.) The following questions and answers were then read to witness from the transcript of his testimony given in the superior court, in the case of Sam Olson against John Collins: 'Q. Did he (meaning your father) know anything

Collins vs. Hoehle.

about this proposition of yours and Jake's, when you had this mortgage first drawn, to have it drawn for $4,000, and give it to him to secure him? Didn't you tell him about that? A. Yes, sir.' Q. Did you so testify in the superior court? A. I don't remember testifying that. I don't believe that I ever told him. If I did so testify it is not true. (Reading further from transcript): 'Q. Did you tell him at the time what your object was in doing it? A. Yes, sir.' I don't remember so testifying in the superior court. If I did so testify it is not true. Q. What was that mortgage of $4,000 drawn for? (Objected to by plaintiff as immaterial. Objection overruled, and exception.) A. It was drawn for the purpose of staving off this debt of $1,200, and of raising some money,— in getting the money that we had due us to pay our other creditors, and still go on with our work. I requested Mr. Lyons to draw this mortgage, but it was by request of both Erickson and myself. Q. Was not one of the purposes for which this mortgage was drawn to stand off the rest of your creditors until such time as you could get your logs down? (Objected to as irrelevant and immaterial. Objection overruled, and exception.) A. I expect it was partly for that purpose. I suppose that had something to do with the making of this mortgage for so much. I executed this mortgage in Mr. Lyons' office. Then took it, and gave it to Jake Erickson. He said he would take it, and think it over."

Jacob E. Erickson, a witness for the defendant, testified that he was requested to go up to Mr. Lyons' office, and sign the instrument, by Mike Collins; and the old man, *Mr. Collins* (the plaintiff), was present there. "I told him I would look it over, and see what it was, and then he handed it to me, and I kept it. The plaintiff in this case had some further talk with me about signing this mortgage at my house. It was after Mike had gone away, and before he came back. He says, 'Why don't you sign the mortgage, or the paper?'

Collins vs. Hoehle.

I think he used the word 'paper,' or he wanted the note paid. He asked me why I didn't sign the paper. I told him it was more than the $1,200 note called for,— $4,000,— and that I would not do anything then without consulting our attorney, Mr. Rock. I had some other talk with him about signing that mortgage up in Catlin, Butler & Lyons' office. It started with giving an order on Gilbert for his note, and I told him I wouldn't give any order. That was before Mike got back, and after he had gone away. I don't recollect that I ever had any other talk with him about security. Q. Now, Jake, how did it come that this $4,000 mortgage that you hold there was drawn? (Objected to as irrelevant, incompetent, and immaterial. Objection overruled, and exception.) A. The purpose or object for which the mortgage was drawn was to bar other creditors out,— depriving other creditors from deriving any benefit from what was in the concern. Mike Collins, talking it over, suggested that we draw up a mortgage for $4,000 to bar other creditors out from deriving any benefit out of what was in the concern. At that time the firm was heavily indebted. There were bills pressing and one or two suits pending at the time. I believe there was one judgment. The firm did not then have money to pay these bills with that were due and pressing. I believe the indebtedness of the concern was somewhere between four and five thousand dollars, including the *Collins* note."

The defendant then offered in evidence page 30 of the transcript of the testimony of the witness Mike Collins given in the superior court in the case of Olson against Collins, and the same was received, and read to the jury, over plaintiff's objection. " Q. You and Jake frequently talked over the situation of your affairs in connection with his claim against you? A. Yes. Q. He knew about how your business stood, didn't he? A. My father? Q. Yes, sir. A. I

think not. 'Q. He knew you were owing people? A. I don't know as he did. Q. You never told him so, did you? A. No, sir. Q. Did he know anything about this proposition of yours and Jake's, when you had this mortgage first drawn .for $4,000, and gave it to him to secure him? Did you not tell him about that? A. Yes, sir. Q. Didn't you tell him at the time what your object was in doing it? A. Yes, sir."

Defendant offered in evidence page 14 of transcript of plaintiff's evidence given in the former trial of this case, as follows: "I don't think Erickson & Collins had money at that time to pay the bills that were being pressed. Erickson said it, and Mike Collins, too. He told me in that conversation about Jake wanting to make an assignment. You and him had papers got out for an assignment, and he wouldn't sign it, and they wanted him to sign it, and he wouldn't do it."

Defendant then offered in evidence page 2 of the deposition of plaintiff taken before C. R. Fridley, court commissioner: "I didn't have any conversation with Erickson & Collins, or either of them, relative to giving me security for that debt when they borrowed the money. I did last May. I had a talk with both of them. I didn't ask them for .a mortgage. They offered to give me a mortgage. I knew the firm was indebted to several other people. I learned while Mike was away that several other men, whom they were owing, were pressing payment of their claims. I didn't suppose they had any money at that time to pay either my claim or any other claim that was due."

At the close of the testimony the plaintiff moved the court to strike out all the evidence relating to the agreement of Erickson & Collins to give a $4,000 mortgage to the plaintiff for the purpose of hindering and delaying their creditors, and to the execution, preparing, and signing of that mortgage, which motion was denied, and exception taken. The plaintiff moved the court to direct a verdict in his favor,

which motion was denied, and the plaintiff excepted.    The
jury found a verdict in favor of the defendant, and the court
denied a motion to set the same aside and grant a new trial.

For the appellant there was a brief by *Catlin, Butler &
Lyons*, and oral argument by *Thos. E. Lyons*.

*A. T. Rock*, for the respondent.

PINNEY, J.   The cross-examination by the defendant of
his own witness Michael Collins, and the introduction of
contradictory statements made by him, was for the purpose
of his impeachment, and, beyond doubt, was effective for
that purpose.   The defendant voluntarily called Mike Col-
lins as a witness in his own behalf, without being under any
legal necessity or obligation to do so.   Under the universal
and well-settled rule of evidence, the defendant should not
have been allowed, under the circumstances stated, to im-
peach him.   This rule was violated repeatedly, and in a
marked degree, as the foregoing statement of the case clearly
shows.   The law upon this subject in this state has been
definitely settled.   *Richards v. State*, 82 Wis. 172–180.   The
rule is there stated to be that, while a party may show that
the testimony of his own witness is incorrect or false in a
matter material to the issue, he cannot be allowed to im-
peach such witness by direct testimony either of his bad
reputation for veracity, or that he testifies to one thing in
court and asserts the falsity of it out of court.   This rule is
elementary.   The defense sought to establish, by the testi-
mony of Mike Collins, a fraudulent intent on the part of
Erickson & Collins and participation in it by the plaintiff.
The admission in evidence of his statement to the effect that
he had informed the plaintiff of such intent could not but
exercise a prejudicial influence upon the plaintiff's case.

In *Smith v. Dawley*, 92 Iowa, 312, one Effie Childs was a
witness for the defendant, and her testimony was favorable
in part to the plaintiff, and afterwards the defendant sought

to impeach her by introducing a letter written by her, which the court rejected, and this was assigned as error; but the court upheld the ruling, saying: "Conceding that, if defendant was misled by the witness, and he placed her on the stand in pursuance of what she had said her testimony would be, he might show to the court or jury the facts leading to her being called as a witness, it does not follow that he can be allowed to impeach his own witness in violation of the general, if not of the universal, rule." To the same effect is *Adams v. Wheeler*, 97 Mass. 67, where it was held that a party could not be allowed to prove by a witness statements previously made by a witness called by himself, inconsistent with his testimony at the trial, which would not be admissible as independent evidence, and could have no effect but to impair his credit with the jury. In *People v. Safford*, 5 Denio, 112, where the point was material, the court, after adverting to the conflict of cases and text-books on the subject, proceeded, as it is there said, to consider it on principle, and determined that a party cannot prove contradictory statements made by his own witness. The court held that such evidence is only allowable with a view to the impeachment of the witness, which is not open to the party producing him. In *Thompson v. Blanchard*, 4 N. Y. 303, 311, a new trial was granted for a violation of the rule in question. *Coulter v. Am. Merchants' Union Exp. Co.* 56 N. Y. 585–589; *Stearns v. Merchants' Bank*, 53 Pa. St. 490.

It appears to, have been held in England, by the decided weight of authority, that, even when a party was surprised by the testimony of his witness, he could not impeach him by proof of different statements made by him out of court before the trial. But this question was set at rest by a statute allowing a party to prove that his own witness had made a statement inconsistent with his present testimony, but this was allowed only in case, in the opinion of the judge, such witness proved to be adverse, and only after laying the

foundation for impeachment as in other cases. It seems that, although the conflict of opinion upon this question which arose in England has continued in the American courts, it appears to be the rule, supported by the great weight of authority, that, in the absence of statute, a party cannot be allowed to offer direct proof by other witnesses either of the bad character of his own witness for truth and veracity, or that he has previously made statements inconsistent with his present testimony. 3 Jones, Ev. § 858, and cases cited; 1 Greenl. Ev. § 444.

This rule has been so applied that, when one party calls a witness of the adverse party to prove certain facts, he is thereby prevented from impeaching such witness; and so, even where a litigant calls the adverse party as his own witness to prove matters not merely formal, or where he is not compelled by law to call him. In Jones, Ev., *supra*, it is said: " Although the weight of authority sustains the view that a party cannot prove the contradictory statements of his own witness to discredit him, yet the party is not wholly without remedy, if surprised or deceived by the testimony. In such a case he may interrogate the witness in respect to previous statements inconsistent with the present testimony, for the purpose of probing his recollection. He may, in this way, show the witness that he is mistaken, and give him an opportunity to explain the apparent inconsistency. This is also proper to show the circumstances which induced the party to call the witness. But, where the sole effect of answers to such questions would be to discredit the witness, the questions should be excluded; and, if the recollection of the witness is not refreshed after such questions, the party cannot prove his contradictory statements by other witnesses."

The erroneous ruling of the circuit court in this regard requires a reversal of the judgment appealed from.

*By the Court.*— The judgment of the circuit court is reversed, and the cause remanded for a new trial.