Cobb, Plaintiff in error, vs. The State, Defendant in error.

*December 10, 1926—January 11, 1927.*

*Rape: Intercourse with female under sixteen years of age: Questions for jury: Whether case is one of extortion: As to defense of alibi: As to credibility of, witnesses: Appeal: Right of defendant to have evidence reviewed: Trial: Instructions: As to presumption of innocence: As to uncorroborated testimony of female and her father: Harmless error.*

1. The evidence in a prosecution for statutory rape committed by the defendant upon a sixteen-year-old servant girl employed in his home is examined, and the jury is *held* justified in determining the defendant guilty.    p. .657.

2. The issue whether the charge of the girl was the result of a scheme of her father to extort money from the defendant is for the jury; and in this case the implied finding of the jury that it was not, is approved by this court.    p. 657.

3. In a prosecution for statutory rape it will be assumed that the defendant, who took the stand and made a general denial, would have denied participation in all matters charged by the complaining witness if he could truthfully do so.    p. 662.

4. The issue of *alibi* is for the jury, as is also the question whether the testimony of defendant's family doctor as to what the complaining witness told him when he was called when she became ill should be given credence.    p. 663.

5. In a criminal case the defendant has the right not only to the solemn judgment of the trial court on the question whether guilt was sufficiently proven, but on writ of error may demand the deliberate opinion and judgment of the supreme court on the same question.    p. 664.

6. Instructions as to the presumption of innocence, taken as a whole, are *held* to indicate that the jury should await the introduction of all the evidence before forming an opinion, notwithstanding a statement by the court that such presumption prevails "unless and until overcome by proof of guilt beyond a reasonable doubt."    p. 664.

7. The refusal to give an instruction as to the credibility of the complaining witness and her father to the effect that their testimony should be weighed with caution is *held* not error where their testimony was strongly corroborated. [*Abaly v. State,* 163 Wis. 609, distinguished.]    p. 665.

Error to review a judgment of the circuit court for Polk county: W. R. Foley, Circuit Judge. *Affirmed.*

The plaintiff in error, hereinafter called the defendant, was convicted of the offense of statutory rape. The defendant in 1924 and for some time prior thereto was a married man living with his wife and two children in the village of St. Croix Falls, Polk county, Wisconsin, where he was engaged as a cashier of the First National Bank. The complaining witness, Mabel Casperson, became sixteen years of age in April, 1924, and in January of that year was engaged as a maid to do general housework in the defendant's family.

According to the testimony of Mabel, some six weeks after her said employment the defendant had illicit relations with her while his wife was out of the city. She also testified that on a number of occasions thereafter such relations were repeated, she testifying that prior to the 24th day of August of the same year there were three instances at the home and one at their summer home at Deer Lake; that the last occasion was on August 24, 1924, while the defendant's wife was confined in a hospital in said village, where she had undergone an operation, and while the two minor children were at Minneapolis, and it is as the result of that incident that Mabel claims she became pregnant; that several months thereafter the defendant became anxious as to Mabel's condition and inquired of her whether she was pregnant, to which she replied that she did not know; that he then advised her to take a hot bath to stimulate the return of her monthly periods; and that he, the defendant, went to the basement and built a fire for that purpose; that after another month the defendant advised her to apply to one Dr. Wilson, a chiropractor, for treatments, stating that he would pay for the same, and that Mabel complied with this suggestion and took eleven treatments, covering a period of about three weeks, which treatments consisted of operating an electric device along the course of her spine; and that none of the means resorted to at the suggestion of the defendant proved effective. Some time thereafter, Mabel while in her room at the defendant's home was taken violently ill, such illness

manifesting itself in spells of vomiting and convulsions; that defendant's wife thereupon telephoned for Dr. Riegel, the physician of her family, who examined the patient and ascertained that she was pregnant.

The following day Mabel telephoned to her mother, who came to defendant's home, and she was there told by Mabel that she was in the family way and that the defendant was the cause of her condition. While Mabel's mother, Mrs. Casperson, was at the defendant's home, her husband called upon the defendant at the bank, and after leaving defendant's home Mrs. Casperson went to the bank. Mrs. Casperson stated that upon meeting the defendant at the bank she "asked him if he was to blame for that with Mabel. He said that he couldn't see that he was." Continuing, her testimony is in part as follows:

"I told him 'either you or the girl told a lie. We want to get the girl down to prove it.' Then he [the defendant] called Mr. Casperson out of the way and he came back again and asked me, 'Did you tell Mrs. Cobb?' I said 'No, that is your business.' "

Emil Casperson, Mabel's father, testified in part as follows:

"*Q.* What did you do after you talked to your wife there at the bank? *A.* I called *Mr. Cobb* in.

"*Q.* And was there any talk with the defendant there in your presence? *A.* Yes. . . .

"*Q.* Did you overhear any conversation between your wife and the defendant there at that time? *A.* Yes, sir, I did.

"*Q.* Will you state what the conversation was? *A.* It was whether he was telling the truth or Mabel was lying. . . . Well, my wife said that she had been told by Mabel that he was guilty and he answered and says, 'No, I don't think so.' Then my wife says, 'Then we will have to have the girl down to find out who is telling the truth. One of them must be lying.'

"*Q.* Then what happened? *A.* Then *Mr. Cobb* called me back into the back room of the bank, on the stairway, and he says, 'Emil, I am a brute. I have to admit that I done it, but I didn't abuse her.'

"*Q.* Well, had you said anything to *Mr. Cobb* before he made that statement? *A.* I was so stunned I couldn't say anything.

"*Q.* I mean before he said that to you there on the stairway; had you said anything to him? *A.* No.

"*Q.* Did the defendant say anything else to you there at that time? *A.* Not back there.

"*Q.* Where did you go from the back stairway? *A.* Back to the library room where Mrs. Casperson was.

"*Q.* Well, was there any more conversation there? *A. Mr. Cobb* asked me what I was going to do with him. I told him I was in position to say nothing."

It also appears that Mabel at that time told the defendant's wife, at the home, that her husband was the cause of her trouble. Mabel then left the defendant's home, went to St. Paul where she remained a short time, and then entered a mission home in said last named city, where she remained for some time, until after the birth of the child in June, 1925.

There was further testimony on the part of Mabel's father, to the effect that about a month after Mabel left the defendant's home he asked the defendant what he was going to do about the matter; that the defendant and his wife, on the same evening, called at the Casperson home with a view of ascertaining the demands of Casperson; that Casperson fixed the sum of $5,000 as the amount for which the matter might be settled, but that no sum was agreed upon.

It further appears from the evidence that Mr. Robinson, defendant's father-in-law, who was the president of the First National Bank and the principal stockholder thereof, became interested in making a settlement and in hushing up the matter for the purpose of avoiding a possible injury to the business of the bank, and that he employed an attorney at Min-

neapolis to see what could be done about the matter. A number of interviews between this attorney and Mr. Casperson and Casperson's brother, a resident of St. Paul, ensued, but no definite amount appears to have been fixed and no settlement was actually made, although the attorney claims that he suggested that Mabel's expenses would be paid and that the child would be taken care of so that it would not become a burden upon the Caspersons.

This, in substance, constitutes the State's case, and further facts in connection therewith and those connected with the defense will be referred to in the opinion.

For the plaintiff in error there was a brief by *W. M. Steele* of Superior, attorney, and *McClearn & Gilberson* of Duluth, of counsel, and oral argument by *Mr. Steele* and *Mr. Hugh J. McClearn.*

For the defendant in error there was a brief by the *Attorney General, J. E. Messerschmidt,* assistant attorney general, and *Howard D. Blanding,* district attorney of Polk county, and oral argument by *Mr. Blanding* and *Mr. Messerschmidt.*

Doerfler, J. The charge upon which the defendant was convicted by the jury is founded upon Mabel's claim with respect to the alleged relations at the home of the defendant several days after defendant's wife was taken to the hospital to undergo an operation, and is fixed as having occurred on or about the 24th of August, 1924. Defendant in his testimony generally denied all sexual relations charged against him by the complaining witness. The defense also attempted to establish an *alibi;* also it was urged that the surrounding facts and circumstances were such as to discredit entirely the prosecution's claim; that the prosecution was conceived by Mr. Casperson, the father of Mabel, with a view of unlawfully extorting money from the defendant and his relatives. In other words, that the whole proceeding amounted to a blackmail and a holdup; that some person other than the

defendant was the father of this child; and that in order to place the responsibility upon the defendant, a prominent business man of St. Croix Falls, this scheme was concocted. It is also claimed by the defense that Mabel's testimony is improbable and is unworthy of belief.

We have scrutinized the evidence in this case with a great deal of care and caution, and it leaves upon us a very marked conviction that the charge of the prosecution is well founded and that the jury was fully justified in arriving at a verdict of guilty herein. Many cases involving a crime like the one herein charged have come before this court for review, and the defenses herein attempted to be made are not uncommon. It may be true that schemes such as are suggested by the defense herein are at times devised for no other purpose than to extort money from one entirely innocent of crime, but it appears to us that the instant case is not one of that kind.

It is also the claim of the defense that the jury's verdict is supported solely by the testimony of Mabel and that it is uncorroborated by any other credible testimony, and is refuted by the actual facts and circumstances disclosed. It must, of course, be recognized that as a rule no eye-witness, excepting the participants, can be produced to support an alleged act of illicit sexual relations. That is due to the very nature of the offense. In the instant case we have a young girl, who at the time of the commission of the offense was sixteen years of age, employed in the family of the defendant, who occupied a prominent position as cashier of a bank located in the place of his residence and a high social position in the community where he resided. Although of humble origin, she had received the benefits of a common school education and had had one year of high school. She was employed as a maid at very moderate wages. Upon the trial she not only acquitted herself with credit on her direct examination, which was exhaustive, but she also successfully maintained her position throughout a protracted cross-exam-

ination.   We have before us merely the cold record, and while it is impossible to peruse this record without evolving a picture of the entire situation, the impressions made upon our mind are of little value as compared with those which must result during an actual trial.   The jury had before it not only the prosecutrix during the entire trial, but also all the other witnesses in the case, and their acts and demeanor upon the stand, as has been repeatedly held by this court and all appellate courts, enter largely the realm of credibility, which is denied the judges of appellate courts.

With the contention of the defense, however, that Mabel's testimony is uncorroborated, we cannot agree.   That the prosecutrix had illicit relations must be conceded.   That such relations were had on or about the 24th of August, 1924, is highly probable, as is shown by the birth of the child in June, 1925.   That there were many opportunities afforded while Mabel was employed at the home of the defendant, while defendant's wife was absent, must also be conceded.   Defendant's wife during a large period of the time involved herein was ill, and this is a circumstance which is somewhat persuasive.   It may be conceded that there is no evidence in the case that the defendant was seen in company with Mabel at any place or places outside of his home, and the evidence is entirely barren of any manifestations of affection on his part towards her.   In this connection it must be considered, however, that the defendant was a man of prominence in his community, both in the business and in the social world.   There was a large chasm separating the two, from a social standpoint.   It would be indiscreet, indeed, if he were seen in her company at public places in his home town, and it would be not only indiscreet, but dangerous, to indulge in familiarities in his home, in the presence of his wife and children.   So that the evidence, in the phase thus referred to, is neither remarkable nor surprising.   The defendant cared nothing for the prosecutrix excepting only

as an object which afforded him an opportunity to indulge in lust. Outside of that she was a mere domestic.

When it was definitely ascertained by the examination of the doctor that she was in the family way, she immediately communicated with her mother, and when the mother called at defendant's home she informed her of what had happened and placed the blame upon the defendant. She not only made this charge to the mother, but she did likewise to the defendant's wife. What transpired at the bank when the parents of Mabel were first informed of the matter, whether viewed in the light of the testimony of Mrs. Casperson, the mother, and the testimony of the father, or in the light of defendant's own testimony, is not only significant, but strongly persuasive, that the defendant is guilty of the charge of which he has been convicted. Mrs. Casperson testified that at the First National Bank at St. Croix Falls she asked the defendant if he was to blame for Mabel's condition, to which he replied that he couldn't see that he was. Mr. Casperson testified that on the same occasion he asked the defendant if he was guilty or not, and he said "No, no, I don't think it can be so." The defendant testified that when Casperson accused him he said, "It cannot be. It absolutely is not so." In reply to the following questions put to him he made the following answers:

"Q. What did you say to Casperson when you were there in the waiting room? A. I said that it couldn't be so; that it wasn't so.

"Q. You told them that that was once you had nothing to do with it? A. I did.

"Q. Why did you say 'once'? A. I didn't say 'once;' that is your leading question."

Here it must be borne in mind that the defendant was then charged for the first time with the commission of a serious offense. He maintained throughout the entire trial that he never had relations with Mabel. An innocent, red-

blooded man, in the prime of life, with a wife and family, occupying a prominent position in the community, would have resented such a charge in the most violent manner imaginable. His answer would not be expressive of any doubt in the matter. Instead of resentment, according to his own statement, he said that "it couldn't be so." In this respect his testimony does not differ materially from the testimony of both Casperson and his wife, to whom he said, in substance, according to their testimony, "No, no, I don't think it can be so."

If there were no other corroborating testimony in the case, this attitude of the defendant upon such a momentous occasion, in itself would be strongly convincing of his guilt. But the testimony thus dwelt upon does not constitute the only corroborating testimony. It is admitted that the defendant called Mr. Casperson into the stairway leading to the furnace. Whatever may be said by way of criticism of Casperson's subsequent acts in endeavoring to secure a money settlement, his mental attitude toward the defendant can readily be conceived when he first became wise to what had occurred. He testified that he was stunned, and that during the time he was in the stairway leading to the furnace he said nothing to the defendant. That Casperson was humiliated and in a highly resentful state of mind at that time is but natural. On that occasion, when the parents of this young girl, who when the various acts were committed was between fifteen and sixteen years of age, were first informed of the heinous offense, it is but natural that they indicated every manifestation of chagrin and resentment. Therefore the defendant evidently foresaw an outburst, and, laboring under the accusations of his guilty conscience, made the admission to which the father testified, in which it is claimed he said "Emil, I am a brute. I have to admit that I done it, but I didn't abuse her."

This was a State case, not one brought for the purpose of collecting damages. Neither the prosecutrix nor her parents

were parties to the proceeding. The very next day after the occurrence at the bank the defendant and his wife appeared at Casperson's home for the avowed purpose of ascertaining how the matter could be hushed up and settled, and this attempt at settlement was followed by the hiring of counsel, who for some time thereafter attempted to effect a settlement. It may be admitted that many innocent persons are persuaded to submit to a holdup in order that their social and business relations may not be affected, but the effect of such attempt, and its probative force, were for the jury.

Mabel testified that about two months after the 24th of August, 1924, the defendant became worried about her condition and that he so expressed himself. She also testified that the defendant recommended that she take a hot bath in order to produce menstruation; that he himself went to the basement and started the fire to heat the water; that she took this bath, without effect; and that shortly thereafter he advised her to call on Dr. Wilson, a chiropractor, for treatments, promising that he would pay therefor. Mabel further testified that for a period of three weeks she took eleven electric treatments from the chiropractor, without result. These statements, if true, have a strong probative value, and are indicative of guilt on defendant's part. Furthermore, these statements were not specifically denied by the defendant while he was on the stand. The only denial that can be claimed is in the nature of a general denial, which is embraced in the following answers to questions put to the defendant by his counsel:

"*Q.* You have heard the testimony of Mabel Casperson, accusing you of the various things of which she has accused you, have you? *A.* I have.

"*Q.* I will ask you generally whether or not you are guilty of those things? *A.* I am not."

It appears on the face of these questions that they were directed to the alleged acts of intercourse, and not to the various other matters herein referred to, which had an in-

cidental bearing upon the question of guilt. Whether defendant's counsel failed to realize the important bearing of this testimony upon the issue involved, or whether he entirely overlooked the same, or whether he intentionally steered clear thereof, it is impossible for us to determine, but the testimony of Mabel is in the record, and it must be assumed that if the defendant were in a position where he could truthfully deny his participation in these matters he would have been called upon to do so.

Under this state of the record it can hardly be said that the jury's verdict was based solely upon the uncorroborated testimony of the complaining witness, nor can we say that there is not ample credible evidence in the record to sustain the jury's verdict.

As to the first acts of intercourse, occurring on or about the 1st of March, 1924, the defendant takes the position that Mrs. Cobb during that period of time was ill and that she spent a great portion of her time in the house. The testimony does not establish, however, that she was continually confined to her bed or that she did not go out upon occasions, thus affording the defendant an opportunity to have relations with the complaining witness. The complaining witness testified that upon the occasion of the first relations defendant's wife spent a day or two in Minneapolis. It is possible that the complaining witness might be mistaken as to the whereabouts of the wife, but the important fact is not whether she was in Minneapolis or whether she attended a lodge, but whether the intercourse actually took place.

From the testimony of the defendant, his mother, and his brother and sister, it would appear that on the evening of the 24th of August the defendant spent his time at Deer Lake, where his mother owned a cottage. The attention of these witnesses was not called to the claim made by the complaining witness that she had relations on the evening of the

24th of August, until some time in the latter part of the
winter or the spring of 1925. The witnesses testifying to
the whereabouts of the defendant may have honestly believed
that defendant was present at Deer Lake on the evening in
question, and yet they may have been mistaken. The issue
of *alibi* was one which under the evidence was peculiarly for
the jury.

It is next claimed that this prosecution is the result of a
scheme concocted by Mr. Casperson, the father of Mabel,
for the purpose of extorting money. If the charge made by
Mabel is based on truth, there is no reason why he was not
entitled to compensation. Casperson expressly denied in his
testimony that he threatened the defendant with criminal
prosecution or with imprisonment unless a settlement were
made. This issue was also one for a jury to decide.

Dr. Riegel, who was called upon the occasion of Mabel's
illness in February, 1925, testified that Mabel told him that
she had been out with different boys and gave their names;
that he asked her if she knew which one was responsible for
her being pregnant, and that she answered that she did not
know; and that she did not mention *Mr. Cobb's* name. This
alleged admission on the part of Mabel was specifically de-
nied by her. Dr. Riegel was the family physician for the
Cobbs, and it was at the Riegel hospital that Mrs. Cobb had
been operated upon and had received treatment. We can
naturally presume that, being at the Cobb home, and know-
ing that Dr. Riegel was the family physician, the matter of
implicating *Mr. Cobb* presented a rather delicate situation
for her. Furthermore, Mabel denied having any acquaint-
anceship with some of these boys, and the others denied hav-
ing had any relations with her, or having been in her com-
pany excepting on a few occasions. Whether Dr. Riegel's
testimony should be given credence, under the circumstances,
was also peculiarly within the province of the jury.

From a careful review of all the evidence in the case, and bearing in mind what is said in the opinion in the case of *Gerke v. State*, 151 Wis. 495, 139 N. W. 404, that "the prisoner has the right not only to the solemn judgment of the trial court on the question whether his guilt was sufficiently proven, but upon writ of error he has the right to demand the deliberate opinion and judgment of this court upon the same question," the deliberate opinion of this court is that the judgment of the lower court should be affirmed.

Defendant's counsel base error upon the following instructions of the court:

"You are instructed that the law presumes, and that you must presume, that the defendant is innocent of the crime charged until, from all the evidence in the case, he is proven guilty beyond a reasonable doubt, and that the burden rests upon the state to establish his guilt by such proof.

"This presumption of innocence is a shield or protection that the law throws around every person who is being tried for a criminal offense, and it is your duty to give the defendant the full benefit of it, and not to convict him of the crime with which he stands charged unless from all the evidence in the case you and each of you are convinced of his guilt beyond a reasonable doubt. This presumption of innocence attends the defendant through the whole trial and prevails unless and until overcome by proof of guilt beyond a reasonable doubt."

The last sentence of this instruction is assailed, under the decision in the case of *Windahl v. State*, 189 Wis. 424, 207 N. W. 694. The instructions above quoted followed in regular sequence in the course of the charge upon the subject of the presumption of innocence, and on two occasions the jury was expressly told that this presumption is not overcome unless from all the evidence in the case the defendant is proven guilty beyond a reasonable doubt. The last sentence of these instructions, when standing alone, is subject to the criticism made by counsel, but in reading all of the instructions we

Cobb v. State, 191 Wis. 652.

are satisfied that the jury could not have been misled, and that it was made plain to them that they must not stop anywhere during the course of the introduction of evidence and form their opinion, but must await the introduction of all of the evidence. There was little room in the instant case for the jury to draw the inference referred to in the *Windahl Case*.

It is also argued by defendant's counsel that the court erred in refusing to give certain requested instructions as to the credibility of the complaining witness and her father, and counsel's principal reliance is placed upon the case of *Abaly v. State,* 163 Wis. 609, 158 N. W. 308. In that case it appears in the opinion that the court refused to give a requested instruction to the effect "that in considering the testimony of the complaining witness the jury should use great caution in weighing his testimony; and that it is ordinarily unsafe to convict upon the uncorroborated testimony of an accomplice, and upon the actual commission of the crime charged against the defendant the complaining witness is not corroborated by any other witness."

The instant case differs from the *Abaly Case* in that the testimony of the complaining witness was strongly corroborated, while in the *Abaly Case* there was no corroboration.

*By the Court.*—The judgment of the lower court is affirmed, and the cause is remanded for further proceedings according to law.