MALONE, Plaintiff in error, vs. THE STATE, Defendant in error.

*February 12—March 8, 1927.*

*Criminal law: Evidence of subsequent offenses: Libel and slander: Malice presumed: Trial: Interrogating unwilling witness as to former statements: Leading questions: Evidence: Church directories.*

1. Except as to certain specified offenses, evidence may not be received in a criminal prosecution showing or tending to show that defendant was guilty of the commission of other or similar offenses at some other place and time than that mentioned in the indictment or information.  p. 384.

2. In a prosecution for criminal slander under sec. 348.41, Stats., for alleged slanderous statements relative to a clergyman being the father of illegitimate children, where the defense was a denial and not justification, it was error to admit evidence relative to what defendant said at a subsequent time and place  p. 385.

3. Handbills circulated by defendant subsequent to the alleged slanderous utterance constituting a defiant challenge for a debate on the part of defendant were inadmissible in evidence where the defense was a denial, being material only on the question of malice, which was not in issue.  Where the law presumes malice from the mere speaking of slanderous words, the question of malice is immaterial.  p. 386.

4. That the district attorney, on being surprised at the testimony of his own witnesses, asked such witnesses if they had not testified differently on the preliminary examination, without attempting further interrogation, is not error, since one may question a witness in respect to previous statements inconsistent with his present testimony for the purpose of probing his recollection, to show the witness that he is mistaken, or to show the circumstances which induced the party to call him.  pp. 387, 388.

5. A question propounded to a witness as to whether defendant made a statement of any kind concerning the clergyman and illegitimate children is not leading.  p. 388.

6. The admission of a church directory showing that a certain clergyman was the only person by that name in the church in this country was error, in the absence of a showing that such publication was made under the sanctity of law.  p. 389.

CROWNHART, J., dissents.

Error to review a judgment of the circuit court for Oconto county: Edgar V. Werner, Judge.    *Reversed.*

Plaintiff in error (hereinafter called the defendant) was convicted of criminal slander, as defined in sec. 348.41, Stats. He brings this writ of error to review the judgment of conviction. The information charged:

"That on the 13th day of December in the year 1925, at said county, *Pat Malone,* in the presence and hearing of Joseph Spice and Viola Matravers and divers other persons, did wilfully, unlawfully and maliciously speak of and concerning one Father Peter J. Grosnick, who was then and there a duly ordained Catholic priest, the said Father Peter J. Grosnick not being then and there present, the following false and defamatory words, to wit: 'Grosnick is the father of eight or nine illegitimate children;' thereby meaning and intending to charge the said Father Peter J. Grosnick with the crime of fornication, which said false and defamatory words were then and there intended, and did then and there injure and impair the reputation of said Father Peter J. Grosnick for virtue and chastity, and did then and there expose him, the said Father Peter J. Grosnick, to hatred, contempt, and ridicule, contrary to the provisions of the statute in such case made and provided, and against the peace and dignity of the state of Wisconsin."

The defendant is an evangelist, and during the month of December, 1925, he held a series of meetings during the period of one week in Oconto Falls, Wisconsin. During those meetings he gave utterance to sentiments derogatory to the Catholic Church. This called forth a communication from Father Peter J. Grosnick, a local pastor of a Catholic Church, deploring the attacks made by *Malone* upon the Catholic Church. This communication was printed in the Oconto Falls Herald. At one of his meetings *Malone* read this communication, at the conclusion of which reading, it is contended, he gave utterance to the slanderous statements set forth in the information.

E. O. Sankey, a witness for the State, testified that at one of these meetings *Malone* referred to the communication

signed by Peter J. Grosnick, and said: "From what I see in the paper I have the local priest scratching. That name Grosnick sounds familiar." This witness further testified that *Malone* said: " 'Some years before in Manawa' he met a man by the name of Grosnick. That that man came into his audience leading a gang of men with a rope. He was leading the men with a rope, or 'carrying the rope with the intention of hanging *Malone*' if he said anything that didn't suit,—and that before the meeting was over he had proven to the audience that the man was the father of some illegitimate children."

Mrs. Viola Matravers testified that at the meeting referred to by Sankey, *Malone* referred to the communication signed by Peter J. Grosnick and said: "If that was the Grosnick that he knew in Manawa he was the father of illegitimate children."

Mrs. Walter Lucas testified that *Pat Malone* said that "while he was in Manawa he was holding a meeting there and there was a bunch came in to mob him and that they were going to hang him, and he told them to wait a few minutes until he got through and they would be ready to hang somebody else, and they waited until after he got through talking and they were going to go after Grosnick and Grosnick beat it out of town on a handcar." This was all she could remember about *Malone's* talk concerning Grosnick.

Joseph Spice testified that he heard *Malone* say at one of the meetings: "If this is the man that I knew he had illegitimate children."

The foregoing is all the testimony offered on the part of the State as to what *Malone* said about Grosnick at the time and place alleged in the information.

The State called as a witness Roy Harteau, who was permitted to testify that after the meeting that night at Tom Sagel's residence, in the presence of Rex Allen and one Sankey, *Malone* told them, in effect, that when he was

holding a meeting at Manawa a number of years before a gang was formed outside the tent and it was rumored that they were going to hang *Malone*. They had the ushers leave the front seats empty, and when the mob came in the ushers conducted them to the front seats. They came in carrying a rope and, when seated, this rope extended across the row in their laps. They started to snicker and got a little unruly, and *Malone* told them he was down there to hold that meeting and he was going to hold the meeting. "If you came here with the intention of hanging me, you are all and each one of you covered with a deputy seated back of you." He said, "Now we want peace." *Malone* said, "When I get done, if you still want to hang me, you can do that if you want to, but if you want to hang the other fellow, you can do that;" that *Malone* then started calling names in the audience, and as he called a name he said, "Stand up and answer here;" that after he got them standing up *Malone* said: "Now your daughter gave birth to an illegitimate child on a certain date." He just went down the line and they didn't like to admit it, but finally they did, and after he went down the line *Malone* said: "Now you don't know the father of these illegitimate children, do you?" They said they did not. *Malone* then pointed his finger at this Grosnick sitting in the middle of the gang in the front row, "There is the brute there," and he said that Grosnick went out through the back of the tent and left town on a handcar.

The State also called Rex Allen to testify to what *Malone* said at Sagel's house, but, upon objection, the district attorney was asked what was the purpose of this testimony, and he replied, "the purpose is to show corroboration of the testimony of the State, also to show that he made statements as we alleged he did." The court said: "I think that properly could come in on rebuttal. That is really the proper place for it, on rebuttal." "Mr. Chase: I understood the

court to say yesterday it was admissible but not to prove a second offense." "The Court: That is the ruling now, but you can't crowd it with improper proof." The witness was then withdrawn and recalled on rebuttal and gave testimony much to the same effect as that of Roy Harteau.

Mrs. Roland Rice testified that she attended the meetings held by *Malone* and that at one of these meetings (meeting not identified) she heard *Malone* tell about Grosnick coming in with a rope at Manawa and that *Malone* asked a number of men if their daughters had illegitimate children, etc., very much as detailed by Harteau. She testified that he said Grosnick was the father of those children, but also testified that he didn't say that the Grosnick at Oconto Falls was the father of the children. He simply said a man by the name of Grosnick was the father of the children.

*Malone* testified that he read the communication signed by Peter J. Grosnick at one of his meetings, and that after reading the communication he said to the meeting, "It truly seems to me as though I have someone scratching. Peter J. Grosnick—that sounds very familiar to me. I believe I met him before. It seems as though I have a record of a man by the name of Grosnick in my files. I will look that up and inform you on it. Then I went into my lecture."

The defendant produced a number of witnesses who testified as to what *Malone* said at the time of reading the communication. They all denied that *Malone* said anything to the effect that Grosnick was the father of illegitimate children. The sum and substance of the testimony of such witnesses is that after reading the article *Malone* said: Peter Grosnick, I wonder if I know him; name sounds familiar. If this is the Grosnick I am thinking of, I have got something on him. I am going home. I have some papers. I am going to look through those papers and see, and in the future he might have more to say about Grosnick. The witnesses who thus testified were twelve in number, and

the court refused to permit the production of any further witnesses to testify along the same line. They all testified that they did not hear *Malone* say that Grosnick was the father of illegitimate children, and they substantially all testified that they did not get the impression from *Malone's* talk that Father Grosnick of Oconto Falls was the father of illegitimate children.

The jury rendered a verdict of guilty, and the defendant was sentenced to imprisonment for a term of one year in the county jail. From this judgment defendant brings this writ of error.

For the plaintiff in error there were briefs by *Larrabee & Larrabee* of Chippewa Falls, and oral argument by *O. H. Larrabee.*

For the defendant in error there was a brief by the *Attorney General* and *J. E. Messerschmidt,* assistant attorney general, and oral argument by *Mr. John B. Chase,* district attorney of Oconto county, and *Mr. Messerschmidt.*

Owen, J. It is not contended on the part of the appellant that the verdict is not supported by the evidence. There are eleven assignments of error, and we will discuss those which seem worthy of notice.

Error is first assigned because the court admitted testimony of the statements made at the residence of E. O. Sankey after the meeting of December 13th. It is well settled that, except as to certain specified offenses, evidence may not be received in a criminal prosecution showing or tending to show that the defendant was guilty of the commission of other or similar offenses at some other place and time than that mentioned in the indictment or information. It is not contended here that the evidence was admissible either as direct or corroboratory evidence of the fact that *Malone* uttered the defamatory statements at the time and place as charged in the information. The court stated that the evidence was received for the purpose of showing mal-

ice—a greater degree of malice than that implied by law. The statute, sec. 348.41, under which the defendant was convicted, provides as follows:

"Every person who, in the presence and hearing of another, other than the person slandered, whether he be present or not, shall maliciously speak of or concerning any person, any false or defamatory words or language which shall injure or impair the reputation of such person for virtue or chastity or which shall expose him to hatred, contempt, or ridicule shall be guilty of a misdemeanor for which said person shall be punished as heretofore provided in subsection (1). Every slander herein mentioned shall be deemed malicious if no justification therefor be shown and shall be justified when the language charged as slanderous, false, or defamatory was true and was spoken with good motives and for justifiable ends."

It will be noticed that the statute provides that the slander shall be deemed malicious if no justification thereof is shown. In the instant case no justification was attempted. The defense consisted of a denial that the words alleged were spoken by the defendant. The question of whether they were maliciously spoken, therefore, was not in issue. It was not necessary for the State to prove malice on the part of the defendant in order to justify a conviction. It is a rule universally recognized in the law of libel and slander that the utterance or publication of similar words upon other occasions is inadmissible for the purpose of proving the fact that they were uttered upon the occasion charged. They are admissible only for the purpose of showing malice. In civil actions for libel or slander the question of malice is, as a rule, material. Where the words themselves do not impute malice then malice must be proved. Where the words themselves do impute malice, then evidence tending to show the utterance of similar words upon other occasions is admissible to disclose the extent of the malice in order to enable the jury to fix punitory damages. *Gambrill v. Schooley*, 95 Md. 260, 52 Atl. 500, 63 L. R. A. 427. But

in view of the provisions of the statute upon which this prosecution is founded, no reason is discoverable for making an issue of malice in view of the character of the defense interposed. Had the defense been one of justification, then upon rebuttal it would have been competent and proper for the State to introduce evidence tending to establish malice on the part of the accused. Where, however, the law presumes malice from the mere speaking of the words, if no justification therefor be shown, and where there is no attempt to show justification, the question of malice is utterly immaterial. We must hold that the receipt of the evidence relating to what *Malone* said at the residence after the meeting was error. The same is true with reference to the reception in evidence of a hand-bill or circular put out by the defendant subsequent to the utterance of the words charged constituting a defiant challenge on the part of *Malone* to Father Grosnick for a debate. That publication was in no sense material upon the question of whether the defendant uttered the words charged in the information. It could only go to the question of malice, which, as we have seen, was utterly an immaterial issue under the state of the record.

The question now arises whether the admission of this evidence was prejudicial error. Unless we can say that the same result would probably have obtained in the absence of this testimony, the error must be construed as prejudicial. The evidence shows that there were from one to two hundred people present in the hall during the evening in question. At the most, the State produced no more than four witnesses who testified that the defendant gave utterance to the words charged in the information. The defendant denied that he spoke the words charged. The defendant placed upon the stand upwards of twelve witnesses, all of whom testified that they did not hear the defendant speak the words charged. The testimony of the witnesses who

related the statements made by *Malone* at the house after the meeting is much more impressive than that of any of the witnesses who testified to what *Malone* said at the meeting. The statements made by *Malone* at the house, as testified to by the witness Roy Harteau, for instance, were much stronger and were calculated to arouse greater prejudice against the defendant than the statements attributed to him as having been made at the hall. We do not want to be understood as saying that the case made against *Malone* was weak. But we cannot blind our eyes to the fact that there is a sharp dispute in the evidence upon the main issue, and we cannot say that in the absence of the incompetent evidence the same result would have obtained.

From these conclusions it results that the error was prejudicial and there must be a new trial. Although this disposes of the case, we will discuss some other assignments of error for the future guidance of the court upon a new trial.

It is plain to be seen from the record that the district attorney had most unwilling witnesses upon whom to rely to establish the guilt of defendant. It plainly appears that upon numerous occasions he was surprised at the testimony given by his own witnesses, such testimony being different, and more favorable to the defendant, than that given upon the preliminary examination and upon other occasions. In numerous instances he asked his witnesses if they did not testify differently upon the preliminary examination, and read from their testimony given upon the preliminary examination by question and answer, asking them if they did not so testify. This method of examination was objected to by the defendant's attorney upon the ground that it was an attempt by the district attorney to impeach his own witnesses. It should be borne in mind, however, that this method of examination was not in any instance followed up by the district attorney by an offer to prove what the witness

did in fact testify to upon the preliminary examination. In a great many instances the witnesses admitted that they had so testified upon the preliminary examination, and the inquiry rested there. Unquestionably the rule is that one may not impeach his own witness "by direct testimony either of his bad reputation for veracity, or that he testifies to one thing in court and asserts the falsity of it out of court." *Collins v. Hoehle,* 99 Wis. 639, 75 N. W. 416. This the district attorney did not do. However, one who is surprised by the testimony of his witness "may interrogate the witness in respect to previous statements inconsistent with the present testimony, for the purpose of probing his recollection. He may in this way show the witness that he is mistaken, and give him an opportunity to explain the apparent inconsistency. This is also proper to show the circumstances which induced the party to call the witness. But where the sole effect of answers to such questions would be to discredit the witness, the questions should be excluded; and, if the recollection of the witness is not refreshed after such questions, the party cannot prove his contradictory statements by other witnesses." *Collins v. Hoehle, supra,* at p. 649. See, also, *Richards v. State,.* 82 Wis. 172, at p. 180, 51 N. W. 652; and to the effect that under such circumstances leading questions may be asked, see *Baker v. State,* 69 Wis. 32, 33 N. W. 52; *Schuster v. State,* 80 Wis. 107, 117, 49 N. W. 30.

Error is assigned because of a persistent ruling of the court, illustrated by the following question propounded by the attorney for the defendant to the witness: "What is the fact, Mr. Himes, as to whether or not *Mr. Malone* made a statement of any kind concerning Grosnick and illegitimate children?" This was objected to as leading. The objection was sustained. We cannot say that this was a leading question. It was a direct question, but it was not leading. It did not suggest the answer. The State had charged the

Malone v. State, 192 Wis. 379.

defendant with making certain statements. He claimed he did not make them. He was called upon to prove a negative. We do not know of any practical way in which that may be done except by putting on witnesses and asking them whether they heard the statements made. Any other method is cumbersome, circuitous, and most unsatisfactory. The objection to this type of question should have been overruled.

The State was permitted to introduce a catalogue or directory issued by the Catholic Church containing the names of the ordained priests in the Catholic Church in America. This was done for the purpose of showing that there was no other ordained priest by the name of Grosnick in the Catholic Church of this country, and to establish the fact that the Grosnick at Manawa to which *Malone* referred was the same person as the plaintiff in this action. That catalogues, directories, and other publications edited and published by organizations such as the Catholic Church, put out for the purpose of furnishing general information to its members and to those entitled thereto, and where there is every reason to suppose that they are true and correct, should be receivable as at least *prima facie* evidence of the truth of the matters therein asserted, may be urged with much reason. It is in the nature of information upon which people interested therein generally rely, and it is generally known that such publications, in the main, correctly disclose the facts with which they purport to deal. However, we find no precedent for the reception of such writings in evidence. This subject will be found discussed in sec. 508 *et seq.* in 3 Jones' Commentaries on Evidence (Horwitz edition), from which it appears that to constitute writings and publications of this character evidence of the facts therein contained, it must appear that the records were kept or the publications made to some extent under the sanctity of law. As above stated, while we think there is good reason for the receipt of such publications

in evidence, we find no precedent therefor, and we must hold that the reception of the directory in evidence was error.

While counsel for defendant moved for dismissal of the action at the close of the State's evidence, which motion was denied, the action of the court in this respect is not assigned as error. The ground on which this motion was based was that the State had not proven the identity of the man about whom the remarks were made to be the same man as Father Grosnick, the priest at Oconto Falls. While we are not called upon to discuss this matter, it seems proper for us to say that the position thus taken is untenable. If the defendant made the statements attributed to him by the witnesses for the State, he unequivocally charged a man by the name of Grosnick, who formerly resided at Manawa, to be the father of illegitimate children. The testimony of Father Grosnick establishes the fact that he was a resident of Manawa before he went to Oconto Falls, and that he was the only man of that name not alone in Manawa but in the vicinity of Manawa. To charge a man by the name of Grosnick who lived in Manawa to be the father of illegitimate children constitutes a slander of that man, and it matters not whether at the time of the slander he lived in Oconto Falls or some other place. There can be no doubt that the Grosnick of Manawa to whom *Malone* referred was the complaining witness in this action.

It is unfortunate that this action must again be tried, but such a result seems inevitable from our consideration of the case.

*By the Court.*—Judgment reversed, and cause remanded for a new trial.

CROWNHART, J. (*dissenting*). I respectfully dissent. This court, in recent years, yielding to the urge of the legislature, has been getting away from the archaic common-law rules of exalting legal technicalities above common sense and justice. We now hold that errors in criminal cases must

appear to this court to have been prejudicial before we will reverse. In this case the only error assigned by the court for reversal is that the State proved too much in that it affirmatively made proof of malice, when as a matter of law malice was presumed and no proof thereof was required. I cannot regard such evidence prejudicial because the trial court admitted the evidence only to show malice, and it was not received to prove the utterance of the slander charged. The effect then was that the State proved the guilt of the defendant by a greater quantum of evidence than required. Such evidence should not be held prejudicial when confined, as it was, to prove a fact conclusively presumed to be true. In my opinion we have recently held much more serious errors nonprejudicial. An error is not prejudicial unless in the judgment of the court a different result might probably have been reached but for the error. *Schumann v. State,* 191 Wis. 191, 210 N. W. 360; also see *Cobb v. State,* 191 Wis. 652, 211 N. W. 785; *Bogan v. State,* 191 Wis. 199, 210 N. W. 412; *Sprague v. State,* 188 Wis. 432, 206 N. W. 69; *Werner v. State,* 189 Wis. 26, 206 N. W. 898.

I think the judgment of the circuit court should be affirmed.