JORDAN, Plaintiff in error, v. STATE, Defendant in error.

Supreme Court

*No. 77-277-CR. Argued November 7, 1979.—*
*Decided January 15, 1980.*
(Also reported in 287 N.W.2d 509.)

450

452

For the plaintiff in error the cause was argued by *Ronald L. Brandt,* deputy state public defender, with whom on the brief was *Howard B. Eisenberg,* state public defender.

For the defendant in error there was a brief by *Bronson C. La Follette,* attorney general, and *Betty R. Brown,* assistant attorney general, and oral argument by *David J. Becker,* assistant attorney general.

DAY, J. On January 16, 1975, the plaintiff in error, Kenneth Jordan (defendant) was found guilty by a jury of first-degree murder, party to a crime, and was sentenced to life imprisonment. Writs of error were issued to review the judgment of conviction and an order denying a new trial.

The issues presented for review are:

1. Was a statement made by the defendant to the police obtained in violation of the defendant's constitutional right to counsel?

2. Was it prejudicial error for the trial court to refuse to instruct the jury as to third-degree murder?

3. Was it prejudicial error to allow the prosecution to lead a witness on direct examination?

We conclude that the answer to all three questions is no.

On December 13, 1973, at approximately 1:25 a.m., Ronald Reagan, an off duty Milwaukee police office, was shot and killed during an attempted robbery of the Bungalow Tap tavern in Milwaukee.

There were six patrons and the bartender present when the shooting occurred. Three men entered the bar in single file. The first man walked up to the bartender and asked if there was a telephone. As the bartender turned to point to the phone, the man grabbed his left wrist and pointed a gun in the bartender's side. He said, "Hold it, This is a stickup. Don't move."

By this time the second man was standing behind a woman patron, pointing a gun at her. He said, "If anybody moves, she gets it too." The third man stood in the doorway and did not say anything.

When the holdup was announced, Mr. Reagan, who was sitting at the bar, reached down his righthand side near his foot and pulled out a handgun. He aimed the gun at the second man, who was still pointing a gun at the woman patron, and said something to the effect of "Knock it off. I am a police officer."

At that moment, the first man released the bartender and fired directly at Mr. Reagan. An exchange of shots between the four men took place in rapid succession. The woman who had been held at gunpoint fell to the floor and crouched near the bar.

The man in the doorway fired a number of shots as he was leaving. Mr. Reagan and the second man ex-

changed fire. The first man to enter the bar was the last to leave, and as he was leaving he pulled the trigger on his gun twice more but it made only a clicking noise. The entire incident lasted less than a minute and a half. Neither the bartender nor any patron other than Mr. Reagan was injured during the exchange.

Ronald Reagan died as a result of a bullet wound to the aorta. Another bullet wound to the chest would have also been fatal. According to the examining pathologist there were ten bullet wounds in all including entrance and exit wounds. The only bullet found in Ronald Reagan's body came from a thirty-eight caliber weapon. Spent twenty-two and thirty-eight caliber bullets were found at the bar by investigating police.

Of the five eyewitnesses produced at trial, only the bartender positively identified Kenneth Jordan as one of the men involved in the shooting.[1] He testified that Jordan was the first man to enter the bar, and was the one who had grabbed him. The state also produced another witness, Freddie Mae Pope, who testified that Jordan, her brother Battites Wesley, and a man named Robert Mallory admitted to the attempted robbery and all admitted to firing their guns. She also testified that Robert Mallory had been shot in the lower leg.

The prosecution's case against Jordan included a statement made by him while he was in the custody of the Milwaukee police. In that statement he said that he, Mallory, Wesley, and Freddie Mae Pope drove to the tavern, and parked the car on a street near the rear of the tavern. The three men proceeded to enter the tavern

---

[1] At trial, the defendant produced only one witness, Detective Hugh Thompson of the Milwaukee Police Department. On the evening of the shooting the bartender was asked to look at some photographs of possible suspects by Detective Thompson. The bartender made a tentative identification from photographs of two men who it turned out were not involved. But he said that he could not be sure until he saw them in person.

armed with the handguns. Jordan and Mallory had twenty-two caliber handguns and Wesley had two thirty-eight caliber handguns. He further stated that he entered the tavern first, followed by Mallory, who was in turn followed by Wesley. He stated that a man at the end of the bar started shooting, and then the bartender started to wrestle with him. He said that he did not shoot the man but that he saw Wesley fire at the man with both guns.

Jordan did not testify at the trial.

The defendant's principal argument on appeal challenges the admissibility of this statement. A hearing before Circuit Judge Hugh R. O'Connell was held on June 26, 1974, in order to determine whether Jordan's statement should be suppressed at trial because it was acquired in violation of the United States Constitution. From that hearing the following facts were adduced.

On December 16, 1973, a criminal complaint and warrant[2] were issued for Kenneth Jordan, Robert Mallory, and Battites Wesley charging them with first-degree murder, and attempted armed robbery parties to a crime.[3]

---

[2] It is not clear from the record what facts formed the basis of the complaint, but apparently Freddie Mae Pope's fourteen-year-old brother, Darrell Bell was shot on the same night as Ronald Reagan and based on information that he gave the police when questioned about the shooting, the complaint and warrant were issued.

[3] The relevant statutory sections are:

"940.01. **First-degree murder.** (1) Whoever causes the death of another human being with intent to kill that person or another shall be sentenced to life imprisonment.

"(2) In this chapter 'intent to kill' means the mental purpose to take the life of another human being."

"943.32. **Robbery.** (1) Whoever, with intent to steal, takes property from the person or presence of the owner by either of the following means may be imprisoned not more than 10 years:

"(a) By using force against the person of the owner with intent thereby to overcome his physical resistance or physical power of resistance to the taking or carrying away of the property; or

Jordan contacted Michael Hupy, an attorney in Milwaukee and told him that he and Mallory wished to surrender themselves. Jordan and Mallory were in Chicago at the time and Mr. Hupy told Jordan by telephone not to give a statement to anyone in Chicago or when he got back to Milwaukee. Jordan was told that when he surrendered himself in Illinois he was to talk only to the judge and that he was to tell the judge merely that he wanted to come back to Wisconsin.

William Gardner, deputy district attorney for Milwaukee county, received a phone call from Michael Hupy at 2:30 p.m. on December 19, 1973. Mr. Hupy requested

---

"(b) By threatening the imminent use of force against the person of the owner or of another who is present with intent thereby to compel the owner to acquiesce in the taking or carrying away of the property.

"(2) Whoever violates sub. (1) while armed with a dangerous weapon may be imprisoned not more than 30 years.

"(3) In this section 'owner' means a person in possession of property whether his possession is lawful or unlawful."

"939.05. **Parties to crime.** (1) Whoever is concerned in the commission of a crime is a principal and may be charged with and convicted of the commission of the crime although he did not directly commit it and although the person who directly committed it has not been convicted or has been convicted of some other degree of the crime or of some other crime based on the same act.

"(2) A person is concerned in the commission of the crime if he:

"(a) Directly commits the crime; or

"(b) Intentionally aids and abets the commission of it; or

"(c) Is a party to a conspiracy with another to commit it or advises, hires, counsels or otherwise procures another to commit it. . . ."

"939.32. **Attempt.** (1) Whoever attempts to commit a felony . . . may be fined or imprisoned or both not to exceed one-half the maximum penalty for the completed crime; . . .

"(2) An attempt to commit a crime requires that the actor have an intent to perform acts and attain a result which, if accomplished, would constitute such crime and that he does acts toward the commission of the crime which demonstrate unequivocally, under all the circumstances, that he formed that intent and would commit the crime except for the intervention of another person or some other extraneous factor."

that he be contacted if Mallory and Jordan surrendered to the police. He told Mr. Gardner that he had been engaged to represent Mallory and Jordan.

Robert Mallory's mother contacted the Chicago Police Department. The police were told at 4 p.m. on December 19, 1973, that the two men would be at a certain address in the city of Chicago. Jordan, Mallory and Mallory's father were at the address at the appointed time. The police arrested the two men and read them their *Miranda* rights. Thomas Boyd, the arresting officer, testified that both men indicated that they understood each of these rights.

At the Chicago Police Department Jordan was asked whether he wanted to make a statement. He said that he did not want to talk and all questioning ceased. Sometime between 5:30–6:00 p.m. on the evening of the arrest, a man identifying himself as Michael Hupy, an attorney, called the station where the men were being held and told Thomas Boyd that he was "possibly" going to represent Jordan and Mallory. He asked to speak with them. Officer Boyd would not allow Hupy to speak with the prisoners because he could not verify Hupy's identity. Mr. Hupy asked if a message could be conveyed to Mallory and Jordan to tell them to waive extradiction. Boyd agreed and also asked for Hupy's telephone number. He copied the attorney's name and number and gave a copy to both men. The attorney did not request that Jordan not be interrogated or that he be interrogated only in the presence of an attorney.

Jordan and Mallory waived extradition and were picked up in Chicago on December 20, 1973, by Detectives Brah and Langford of the Milwaukee Police Department. Detective Langford received an information report from a Chicago detective which stated that Jordan had declined to make a statement to the police. The prisoners showed the officers two white slips of

paper with Michael Hupy's name and number and told them that when they returned to Milwaukee they were to call him.

The officers told Jordan and Mallory that on the return trip they wanted no conversation and no statements regarding the incident for which they had been arrested. There was no conversation on the trip to Milwaukee.

Upon arrival at the Police Administration Building in Milwaukee, Jordan and Mallory were placed in separate interrogation rooms. Each prisoner was allowed to call his attorney. Officer Brah turned the phone over to Jordan after dialing Michael Hupy's number. Jordan engaged in a brief conversation with someone at the attorney's office, and then was returned to an interrogation room.

Mallory was informed of his constitutional rights and was asked if he would make a statement. He declined.

Jordan was informed of his constitutional rights in accordance with *Miranda,* and told the officers that he had been advised of his rights by the Chicago police.

With both Officer Brah and Detective Langford in the room, Jordan was advised of the nature of the charges against him. Jordan said that he was not involved. Detective Langford then read to Jordan a statement given by Battites Wesley regarding the attempted robbery and killing. Jordan read part of the statement and then said that Wesley was lying.[4] He said that he would tell the officers what really happened and proceeded to give a statement. This was the statement read to the jury at trial. As the defendant concluded giving his statement, Michael Hupy walked in the room. From the time that

---

[4] The contents of the statement made by Battites Wesley to the police essentially attempted to place the blame on Jordan and Mallory. According to Wesley's statement, Jordan and Mallory were standing over Reagan and shooting at him. Wesley said that he fired three shots at the bar to distract attention and then ran out.

he was taken to the interrogation room to the completion of his statement approximately one hour had elapsed.

Detective Langford testified at the suppression hearing that the purpose of isolating Jordan in the interrogation room was so that they could question him about the murder. Jordan had just finished making an oral statement when Langford was informed that attorney Hupy was out in the hall. The two men sharply disagreed as to the conversation that transpired when they met.

According to Langford, Mr. Hupy asked where Mallory and Jordan were, and he was told that they were in separate rooms. Mr. Hupy asked to see one of them immediately. He was taken to Robert Mallory's room first. Mallory had already declined to give the police a statement on the advice of his attorney. Langford did not tell Mr. Hupy that they were in the process of taking Jordan's statement at the time. Langford waited for Hupy outside Mallory's interrogation room and after five minutes or so, Hupy came out of the room, asked where Jordan was, and was taken in to see him. He testified that he never told Hupy that he had to see Mallory first or that he could not see the prisoners because the officers were taking information from them.

Michael Hupy testified that he had waited approximately ten minutes prior to seeing either of his clients that day. Hupy informed Detective Langford that he wanted to see both Jordan and Mallory. Langford told him that they were taking "some information from them at that time and I [Hupy] couldn't see him right then." He testified that he was told that the police were only taking statistical information. He told Langford that he did not want his clients interrogated. He testified that he was told he had to see Mallory first which he did. After five minutes or so he went directly across the hall to the interrogation room where Jordan was being held. The officers were just completing the transcription of Jordan's statement when Mr. Hupy walked in.

The trial court, in its findings of fact and conclusions of law after the suppression hearing found that attorney Hupy did not authorize any officer to interrogate Jordan. Likewise, the court found that Hupy did not tell the police not to question Jordan prior to going to the Detective Bureau. The trial judge did find that it was not until after Jordan had made the statement that Detective Langford was advised that there was someone to see him. The trial judge also found that there was no evidence of coercion, threats, mistreatment, or promises of leniency made to procure the statement from Jordan.

Based on these findings the trial court on June 27, 1974, ruled that the statements made were admissible at trial, reasoning that the defendant freely and voluntarily waived his rights to remain silent and to have a lawyer present during questioning.

On July 29, 1974, the case against the defendant first came to trial. During the testimony of the first prosecution witness, a mistrial was declared on defendant's motion. Just before coming to trial the defendant pled guilty to attempted armed robbery, party to a crime and received an indeterminate term of not more than fourteen years.

The second trial commenced on January 14, 1975, and resulted in a jury verdict finding the defendant guilty of first-degree murder. A motion for a new trial was filed on December 24, 1975, and was denied November 24, 1976. Further facts will be set forth in the balance of this opinion.

## I. *WAS A STATEMENT MADE BY THE DEFENDANT TO THE POLICE OBTAINED IN VIOLATION OF THE DEFENDANT'S CONSTITUTIONAL RIGHT TO COUNSEL?*

It is contended by the public defender that Jordan's statement was obtained in violation of his constitutional

right to counsel during a critical stage of the prosecution.

The individual's right to counsel under the Sixth and Fourteenth Amendments ". . . means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him—'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *Brewer v. Williams,* 430 U.S. 387, 398, 97 S. Ct. 1232, 51 L. Ed.2d 424 (1977). A more specific right to counsel attaches as an incident to the Fifth Amendment privilege against self-incrimination whenever a suspect is subject to in custody interrogation by the government. *Miranda v. Arizona,* 384 U.S. 436, 467–473, 86 S. Ct. 1602, 16 L. Ed.2d 694 (1966). *Brewer v. Williams,* 430 U.S. at 397.

Jordan had been arrested in Chicago and brought back to Milwaukee after waiving extradition before a judge in Illinois. He was placed in an interrogation room and was being questioned by police officers when he gave his statement. He clearly had a *Miranda* right to counsel during this questioning unless the right was waived.

The public defender argues that Jordan had a Sixth and Fourteenth Amendment right to counsel under *Massiah v. United States,* 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed.2d 246 (1964). *Massiah* held that a Sixth Amendment right to counsel attaches at the time when judicial proceedings are instituted against a defendant. This right to counsel is applicable to the states by the Fourteenth Amendment. *See, McLeod v. Ohio,* 381 U.S. 356, 85 S. Ct. 1556, 14 L. Ed.2d 682 (1965).

However, this court has recently held that when custodial interrogation takes place, it need not be determined ". . . whether the right to counsel stems from the con-

stitutional rights explained in *Massiah,* for under *Miranda . . .* [the defendant] had the undoubted right to counsel from the outset of custodial interrogation."[5] *Schilling v. State,* 86 Wis.2d 69, 79, 271 N.W.2d 631 (1978).

This court takes the position that the standard for determining waiver of the right to counsel in criminal proceedings is the same whether that right arises under *Miranda* or *Massiah.*[6] *Schilling v. State,* 86 Wis.2d at 79. The question then is whether Jordan had waived his right to counsel when he made the statement admitted at trial.

Once the right to counsel has attached the state may not interrogate the defendant unless there is a voluntary

---

[5] In this case the defendant was subject to custodial interrogation. We need not decide the exact time when the *Massiah* right to counsel attaches or whether it arises at a time different from the *Miranda* right to counsel. *See, Brewer v. Williams,* 430 U.S. at 401; Kamisar, *Brewer v. Williams, Massiah and Miranda: What is "Interrogation?" When Does It Matter?,* 67 Geo. L.J. 1, 33 (1978); *Henry v. United States,* 590 F.2d 544, 546–547 (4th Cir. 1978).

[6] The standard to be applied in determining waiver for *Massiah* purposes has received varying treatment by lower federal courts. *See, United States ex rel. O'Connor v. New Jersey,* 405 F.2d 632 (3d. Cir. 1969), cert. denied 395 U.S. 923; *United States v. Durham,* 475 F.2d 208 (7th Cir. 1973); *cf., Maglio v. Jago,* 580 F.2d 202 (6th Cir. 1978) (citing *Brewer v. Williams,* as supporting a right to counsel independently of *Miranda* when judicial proceedings have begun).

In *United States v. Brown,* 569 F.2d 236 (5th Cir. 1978) (en banc) the federal court of appeals applied the standard of *Johnson v. Zerbst; see, infra,* to determine waiver of the right to counsel after the appointment of counsel. This is the same standard that this court applies. In that case, the defendant while on the way to a preliminary hearing after her arrset, signed a waiver of counsel form supplied by the F.B.I. and answered a number of their questions. She was held to have voluntarily waived her right in the presence of her appointed counsel.

464

and knowing waiver of that right. In addition, it is the burden of the state to show that the defendant in fact waived his right to counsel before the police interrogated him. *Schilling v. State,* 86 Wis.2d at 79–80; *Brewer v. Williams,* 430 U.S. at 409–410 (Powell, J., concurring).

The appropriate standard to be applied in determining the question of waiver as a matter of federal constitutional law is whether there has been "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938) ; *Brewer v. Williams,* 430 U.S. at 404. The defendant must have ". . . knowingly and intelligently waived his . . . right to retained or appointed counsel." *Miranda v. Arizona,* 384 U.S. at 475.

"Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders." *Miranda v. Arizona,* 384 U.S. at 475. Neither does the right to counsel depend upon a request by the defendant. "[W]aiver requires not merely comprehension but relinquishment. . . ." *Brewer v. Williams,* 430 U.S. at 404.

Under *Miranda* or *Massiah* the state must show beyond a reasonable doubt that the defendant understood his right to counsel and voluntarily waived that right. *Schilling v. State,* 86 Wis.2d at 80. *State v. Hernandez,* 61 Wis.2d 253, 258, 212 N.W.2d 118 (1973).

The trial court's determination as to compliance with the above-mentioned standards and burdens for determining waiver is not to be disturbed by this court unless

those findings are contrary to the great weight and clear preponderance of the evidence. *Roney v. State,* 44 Wis. 2d 522, 533, 171 N.W.2d 400 (1969) ; *Leach v. State,* 83 Wis.2d 199, 208, 265 N.W.2d 495 (1978) ; *Schilling v. State,* 86 Wis.2d at 81.

The question then is ". . . whether the findings of the trial court supporting the conclusion that . . . [defendant], beyond a reasonable doubt, waived his right to remain silent and to have counsel present are contrary to the great weight and clear preponderance of the evidence." *Schilling v. State,* 86 Wis.2d at 81.

The court must inquire into the "totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forego his rights to remain silent and to have the assistance of counsel." *Fare v. Michael C.,* 442 U.S. 707, 99 S. Ct. —, 61 L. Ed.2d 197, 212 (1979).

It is not constitutionally required that the defendant either orally or in writing expressly waive his right to remain silent or his right to counsel although, if there is such an express waiver, it is "strong proof of its validity." Silence coupled with an understanding of his rights and a course of conduct consistent with waiver may support the finding of "an intelligent and understanding rejection of counsel in situations where the defendant did not *expressly* state as much." *North Carolina v. Butler,* 441 U.S. 369, 99 S. Ct. 1755, 60 L. Ed.2d 286, 292 (1979). (Fn. 4, emphasis in original.)

In *Schilling v. State, supra,* the defendant argued that a statement obtained from him through interrogation was inadmissible because at the time he made the statement he was represented by counsel. His attorney was not notified of the questioning nor was he present during the questioning. This court rejected this contention and

held that ". . . waiver of the right to have prior-retained counsel present at interrogation is sustainable where the waiver is clear." *Id.* at 84. The court has rejected a *per se* rule barring admission of any statement, however freely and intelligently made, after counsel is retained by one who is accused of a criminal offense.

It was not error to admit Jordan's statement. The facts indicating that the statement was voluntarily made with a clear understanding of the right to counsel are numerous. The defendant, Jordan, was twenty years old when he was arrested on these charges. He had a record of at least thirteen arrests prior to the arrest involved in this case. He was thus familiar with the criminal justice system. He had been in custody less than twenty-four hours before making the statement. He had been told to remain silent by his attorney and he had been given his *Miranda* rights fully twice prior to the interrogation. In Chicago he was advised of his rights, and upon being asked if he understood those rights he said, yes. He was then asked if he wanted to make a statement. He said no, and all questioning ceased. From this experience he must have known that his right to remain silent and his right to the presence of an attorney before questioning would be honored.

He also had the opportunity to consult with his attorney by phone when he arrived at the police station and was not questioned until he had that opportunity. He was given the *Miranda* warnings and he indicated that he knew his rights because the same warnings were given to him by the Chicago police. The statement here involved was made within an hour and one-half of Jordan's arrival at the police station. There had been no threats or promises made in connection with the rendering of the statement. The statement was given in narrative form and not in response to a series of questions. True, the detectives did confront Jordan with a state-

ment made by Battites Wesley but that fact alone cannot render the defendant's subsequent statement involuntary or made without full understanding of his right to counsel.

The United States Supreme Court stated in *Miranda v. Arizona,* 384 U.S. at 473–474 that: "Once warnings have been given, the subsequent procedure is clear. . . . If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with an attorney and to have him present during any subsequent questioning." Jordan did not request that his attorney be present after the warnings were given, even though he stated that he understood his right to have his attorney present during questioning. Although "a valid waiver will not be presumed simply from the silence of the accused after warnings are give. . . . ," *Miranda v. Arizona,* 384 U.S. at 475, the fact that Jordan knew his rights, had previously asserted those rights, and almost immediately after questioning began, gave a statement in narrative form, demonstrates that in the "totality of the circumstances" of this case there was a knowing and intelligent waiver of the right to counsel.

On these facts it cannot be said that the findings of the trial judge at the suppression hearing, that the statement of Kenneth Jordan was beyond a reasonable doubt made voluntarily and intelligently, were against the great weight and clear preponderance of the evidence.

## II. WAS IT PREJUDICIAL ERROR FOR THE TRIAL COURT TO REFUSE TO INSTRUCT THE JURY AS TO THIRD-DEGREE MURDER?

The defendant argues that his request for submission of an instruction on third-degree murder, under sec.

940.03, Stats. 1975,[7] should have been granted as a lesser included offense of the charge of first-degree murder. *See*, sec. 939.66(2), Stats. 1975.

In order for a lesser included offense to be submitted to the jury two requirements must be met. First, there must be reasonable grounds for acquittal on instructed offenses greater than that requested. Secondly, there must be reasonable grounds for conviction on the lesser offense requested. *Garcia v. State*, 73 Wis.2d 174, 186, 242 N.W.2d 919 (1976); *Leach v. State*, 83 Wis.2d 199, 217, 265 N.W.2d 495 (1978).

Trial counsel for the defendant apparently did not request submission of a second-degree murder charge. We need not decide whether there were reasonable grounds for conviction on the requested instruction for third-degree murder because there were no reasonable grounds for acquittal on the first-degree murder, party to a crime charge.

The jury was instructed as to the elements for first-degree murder, party to a crime, on a conspiracy theory.[8]

---

[7] Sec. 940.03, Stats. 1975, provides:

"940.03. **Third-degree murder.** Whoever in the course of committing or attempting to commit a felony causes the death of another human being as a natural and probable consequence of the commission of or attempt to commit the felony, may be imprisoned not more than 15 years in excess of the maximum provided by law for the felony."

[8] Sec. 939.05, Stats., provides in part that a person who is concerned in the commission of a crime is a principal and may be convicted of a crime although he did not directly commit it. The scope of the phrase "concerned" in the commission of a crime is defined:

"939.05. **Parties to a crime** . . . (2) A person is concerned in the commission of the crime if he:

"(a) Directly commits the crime, or

"(b) Intentionally aids and abets the commission of it; or

In *State v. Charbarneau,* 82 Wis.2d 644, 264 N.W.2d 227 (1978), this court explained the party to a crime liability under the conspiracy theory. A person may be vicariously liable for the substantive crimes of another in either of two circumstances:

" '(1) The parties may enter into an agreement to commit a particular crime. The fact of agreement imposes liability for the substantive offense on all conspirators when the crime is consummated by a single perpetrator.

" '(2) During the course of executing the crime on which there is agreement, one person commits another crime which is, objectively, the natural and probable consequence of the agreed-upon crime. Under these circumstances, the fact of agreement renders all parties liable for the incidental crime.' " *State v. Charbarneau,* 82 Wis.2d at 652, *quoting from State v. Nutley,* 24 Wis. 2d 527, 555–556, 129 N.W.2d 155 (1964), *cert. denied,* 380 U.S. 918 (1965).

Jordan's statement to the police asserted that Wesley proposed that they "pull a holdup" and that Jordan then armed himself with a gun. The testimony at trial summarized above, shows that Jordan walked into the tavern first and announced the holdup. The bartender and patrons at the bar who witnessed the shooting, testified that the first man to enter the bar fired directly at Mr. Reagan. Only then did Mallory and Wesley commence firing. The contention that Jordan was firing the gun

---

"(c) Is a party to a conspiracy with another to commit it or advises, hires, counsels or otherwise procures another to commit it. Such a party is also concerned in the commission of any other crime which is committed in pursuance of the intended crime and which under the circumstances is a natural and probable consequence of the intended crime. This paragraph does not apply to a person who voluntarily changes his mind and no longer desires that the crime be committed and notifies the other parties concerned of his withdrawal within a reasonable time before the commission of the crime so as to allow the others to withdraw."

See footnote 3.

just to effect an escape and the argument that it was never shown that a bullet fired by Jordan killed Mr. Reagan are irrelevant because from the facts shown here, there were no reasonable grounds for a finding that the killing was not intentional.

In *State v. Shears*, 68 Wis.2d 217, 242–243, 229 N.W. 2d 103 (1975), five men robbed a tavern and in the process shot and killed two men. The evidence produced at trial did not reveal which of the five men did the actual shooting. However, the evidence showed that the killings were intentional. Three of the five men, who were defendants in a consolidated trial, were found guilty of first-degree murder. This court held that ". . . it would have been unreasonable to instruct the jury that they might find the homicide. . . to have been third degree murder." *State v. Shears*, 68 Wis.2d at 243; *See, also, State v. Estrada*, 63 Wis.2d 476, 217 N.W.2d 359 (1974). In *Shears*, the fact that the individual firing the fatal bullet was not identified had no effect because the armed robbery was accomplished pursuant to an agreement and an intentional killing resulted.

In this case, Jordan agreed and participated in the armed robbery. The ten bullet wounds and the conduct of the defendant and his co-conspirators demonstrated an intent to kill Mr. Reagan. There was no reasonable ground to justify an acquittal of first-degree murder, party to a crime, on these facts. *State v. Cydzik*, 60 Wis. 2d 683, 211 N.W.2d 421 (1973), (defendant convicted of first-degree murder although he claimed he only intended to commit the robbery and his accomplice did the fatal shooting). *Compare, Wilson v. State*, 59 Wis.2d 269, 284–285, 208 N.W.2d 134 (1973).

We conclude that the trial court did not err in refusing to instruct the jury on third-degree murder.

## III. WAS IT PREJUDICIAL ERROR TO ALLOW THE PROSECUTION TO LEAD A WITNESS ON DIRECT EXAMINATION?

The public defender also argues that the trial court committed prejudicial error by allowing the prosecution to ask leading questions of Freddie Mae Pope, the sister of Battites Wesley.

A leading question is one "that suggests to the witness the answer desired by the examiner." McCormick's *Handbook Of The Law Of Evidence*, §6 (2d ed. 1972). Leading questions are not prohibited in Wisconsin on direct examination but generally they should be avoided. *State v. Sarinske*, 91 Wis.2d 14, 45, 280 N.W.2d 725 (1979). Sec. 906.11(3), Stats., provides:

"**906.11.   Mode and order of interrogation and presentation.** . . . (3) LEADING QUESTIONS.   Leading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony. Ordinarily leading questions should be permitted on cross-examination. . . ."

The trial court has broad discretion in determining whether the question is truly leading and suggestive and whether the circumstances justify a leading and suggestive question. *State v. Sarinske*, 91 Wis.2d at 46, Judicial Council Committee's Note, sec. 906.11(3), Wisconsin Rules Of Evidence, 59 Wis.2d at R191.

The testimony of Freddie Mae Pope concerned the actions and statements made by Jordan, Mallory and Wesley after the shooting.  She testified that she was sitting in an automobile belonging to her brother while it was parked near the Bungalow Tap on the evening of December 13, 1973.  The three men entered the car, and she specifically identified Jordan as one of those men.  They

drove to her house and there she observed that Robert Mallory had been shot.

After testifying that she could not fully remember the subsequent conversation at her home, the trial court allowed the prosecution to ask her leading questions. Leading questions may properly be used in order to refresh the witness's recollection when her memory is exhausted. McCormick, *supra*, §6, *see, Malone v. State,* 192 Wis. 379, 388, 212 N.W. 879 (1927). When the witness became confused and the prosecutor was not able to phrase a question without leading the witness, the trial judge excused the jury and allowed the prosecution to conduct a *voir dire* examination of the witness to ascertain her understanding of the question and her memory of the conversation. When the jury returned, the prosecution was allowed to ask a single question which was leading. That question and subsequent answer reads:

"*Q.* Okay, now Mrs. Pope, directing your attention to the—that conversation at your house, to the best of your recollection, did Kenny Jordan say that he fired his gun at the man?

"*Mr. Croak:* That's objected to as leading and suggestive.

"*The Court:* Overruled. Go ahead.

"*A.* All of them said it. I still say that all of them said it."

The trial court did not abuse its discretion in allowing the question.

*By the Court.*—Judgment and order affirmed.

COFFEY, J., took no part.