STATE of Wisconsin, Plaintiff-Respondent,

v.

Bradley S. HANSON, Defendant-Appellant-Petitioner.

Supreme Court

*No. 85–0918. Argued November 25, 1986.—Decided March 6, 1987.*

(Also reported in 401 N.W.2d 771.)

For the defendant-appellant-petitioner there were briefs and oral argument by *Michael Yovovich*, assistant state public defender.

For the plaintiff-respondent the cause was argued by *Thomas J. Balistreri*, assistant attorney general, with whom on the brief was *Bronson C. La Follette*, attorney general.

STEINMETZ, J. The first issue in this case is whether the Wisconsin Constitution Article I, sec. 8(1)[1] requires law enforcement authorities to inform a suspect that there is an attorney available and requesting to see him before the individual asks to see an attorney. Stated another way, can an attorney exercise the accused's right to counsel without any request for counsel by the accused?

Another issue is whether sec. 967.06, Stats.,[2] requires the defendant be advised that he is entitled to

---

[1]Article I, sec. 8(1) of the Wisconsin Constitution provides as follows:

"*Prosecutions; double jeopardy; self-incrimination; bail; habeas corpus.* SECTION 8. (1) No person may be held to answer for a criminal offense without due process of law, and no person for the same offense may be put twice in jeopardy of punishment, nor may be compelled in any criminal case to be a witness against himself or herself."

[2]Sec. 967.06, Stats., provides as follows:

"**967.06 Determination of indigency; appointment of counsel; preparation of record.** As soon as practicable after a person has been detained or arrested in connection with any offense which is punishable by incarceration, or in connection with any civil commitment proceeding, or in any other situation in which a person is entitled to counsel regardless of ability to pay under the constitution or laws of the United States or this state, the person shall be informed of his or her right to counsel. Persons who indicate at any time that they wish to be represented by a lawyer, and who claim that they are not able to pay in full for a lawyer's services, shall immediately be permitted to contact the authority for indigency determinations specified under s. 977.07(1). The authority for indigency determination in each county shall have daily telephone access to the county jail in order to identify all persons who are being held in the jail. The jail personnel shall provide by phone information requested by the authority. In any case in which the state public defender provides representation to an indigent person, the public defender may request that the applicable court reporter or clerk of courts

consult with an attorney even though the police are not then involved in any interrogation of him.

The defendant brought a motion to suppress before the Barron county circuit court, the Honorable John E. Schneider, presiding. The motion was denied. A trial was held in Barron county circuit court before the Honorable James Erickson, presiding, and Hanson was found guilty of the first-degree murder of his wife. Hanson appealed the judgment of conviction to the court of appeals on the grounds that his statements given in the hospital were inadmissible.

Bradley S. Hanson, (Hanson) the defendant, and his wife, Cindy, separated on April 26, 1984. She moved in with her parents who lived on a Rice Lake farm. On May 7, 1984, the defendant's probation agent telephoned him regarding threats he had made to his wife. Hanson informed his agent that he did not want to do anything to frighten her.

On May 8, Hanson stopped at a friend's house and borrowed a .357 Ruger and six shells and told his friend he was going on a fishing trip and wanted the gun for target practice.

The following day, the defendant visited his wife at 9 a.m. at her parent's farm. Approximately 90 seconds after his arrival, Cindy's mother, Mrs. Kurschinsky, heard Cindy exclaim, "for God's sake, Brad." Then she heard two shots. When she came into the kitchen, she observed her daughter lying on the floor near the refrigerator.

---

prepare and transmit any transcript or court record. The request shall be complied with. The county treasurer shall compensate the court reporter or clerk of courts for the preparation and transmittal of documents, upon the written statement of the state public defender that the documents were required in order to provide representation to the indigent person."

Mrs. Kurschinsky ran outside to get her husband. She saw Hanson and yelled at him, "My God, Brad, you just shot Cindy and she might even be dead." Hanson stated, "Well, I hope she is." After calling for her husband, Mrs. Kurschinsky heard another shot and observed Hanson holding himself and walking as if he was falling down.

Cindy Hanson suffered three gunshot wounds; one entered her abdomen and exited through her back; and a second one entered through the midportion of her back and exited at the right breast. She also sustained a wound to her right hand which could have been caused by the same shot as the one to her abdomen. Cindy Hanson died as a result of her injuries.

At approximately 9:25 a.m. Hanson arrived at the Lakeview Medical Center and informed a volunteer that he had been shot. When medical personnel asked how he was shot, he stated "My wife and I had an argument." Hanson suffered a gunshot wound in his abdomen which required surgery. While Hanson was in the recovery room after his surgery, the room was guarded by Deputy Sheriff Richard Miller of the Barron County Sheriff's Department. Hanson remained under guard when he was moved to a private room at approximately 3:35 p.m.

The police personnel who guarded Hanson at the medical center were under the following written instructions from Sheriff Wally Larson:

"#1 The officer on duty is to protect Brad Hanson from himself as well as others.

"#2 No visitors other than all medical personnel are to have contact with Brad Hanson. This also includes all attorneys unless requested by

Brad Hanson. His parents and relatives are not to have contact with Brad Hanson.

"#3 The officer is to stay within Brad Hanson's room and within eye contact of Brad Hanson at all times.

"#4 Hospital personnel will furnish beverage and food for the officer on duty.

"#5 Officers are not to ask *any questions* of Brad Hanson, or answer any questions.

"#6 Any complications, officer shall contact Sheriff Wally Larson, 234–8286."

A Rice Lake attorney learned over a police call radio that someone named Hanson was being held by the police on a serious matter and would be having surgery. He telephoned the public defender's office and relayed the information to Assistant State Public Defender Lawrence Durning. Attorney Durning had previously represented the defendant when Hanson was placed on two year's probation in December of 1982 on a criminal damage to property conviction. In fact, Hanson was on that probation when the instant charge arose and was on a probation hold at his initial appearance. However, neither party claims the prior relationship has any legal impact on this case.

On May 9, Attorney Durning arrived at the Lakeview Medical Center in Rice Lake and identified himself to Deputy Miller. Deputy Miller also knew Attorney Durning and his position as assistant public defender through experience from other matters. At approximately 2:10 to 2:12 p.m., Attorney Durning asked to see the defendant at the first available opportunity. Durning stated that he was not the defendant's attorney at that time but appeared as a representative of the state public defender. At that

time, the defendant was in the recovery room, and Durning was not allowed to see or speak to him.

At approximately 2:20 p.m. on the same date, the mother and father of the defendant spoke with Attorney Durning and asked him to represent their son. Durning filled out an affidavit of indigency sworn to by the mother and father as to the defendant's indigency; however, the defendant was an adult of 29 years of age. Durning found Hanson, through that parental interview, to be indigent and eligible for an attorney appointed by the office of the state public defender.

At 2:40 p.m., Attorney Durning advised Deputy Miller that he was Bradley Hanson's attorney, that he had been contacted by the defendant's mother and that he wished to speak with the defendant.

At 2:42 p.m., Deputy Miller and James C. Babler, the District Attorney for Barron county, had a telephone conversation at which time Babler told Miller not to allow anyone to speak to the defendant unless the defendant requested an attorney. This information was conveyed by Deputy Miller to Attorney Durning.

At 2:42 p.m., Durning requested that no one be allowed to talk to Brad Hanson unless he, Durning, was present. He specified that this particularly applied to law enforcement officers.

At approximately 3:20 p.m., Durning was appointed attorney for Bradley S. Hanson by Bradley Keith, First Assistant State Public Defender for the region in which Barron county is located. At this time, Bradley Hanson had not requested an attorney, had not been informed of his right to counsel, and had not been questioned due to his condition after surgery. There-

fore, this appointment was made without Bradley Hanson's request, consent or knowledge.

At 3:35 p.m., the defendant was moved from the recovery room to a private room on the second floor of the hospital.

At 3:37 p.m., Attorney Durning gave Deputy Miller a written request stating that the defendant was not to be interrogated or to talk with or to law enforcement officers or anyone else without Durning's physical presence.

The written communication stated as follows:

"May 9, 1984; To: Sheriff, Barron Cty. WI

"I have been appointed as attorney for Bradley S. Hanson.

"I instruct that he not talk to any law enforcement officer without my physical presence.

"I further instruct he not be interrogated by any law enforcement officer without my presence. That he not be interviewed by anyone without my physical presence.

/s/ Lawrence W. Durning
Lawrence W. Durning
Attorney for Bradley S. Hanson
3:37 p.m."

Attorney Durning was in fact not allowed to see the defendant on the 9th day of May 1984. No visitors other than medical personnel were allowed to have contact with the defendant. On the morning of May 10, 1984, Durning again presented himself at the hospital and was not allowed access to Bradley S. Hanson.

The morning after his surgery on the day after the killing, Hanson was visited by two investigators from the Barron county Sheriff's Department. Hanson

was then receiving morphine every three to four hours.

Prior to interrogating Hanson, the investigators checked with a nurse and another medical center official for approval to speak to Hanson. The testimony of Officer Thomas Avery, Nurse Judy Fischer and Deputy Alfred Lentz was that Hanson was coherent. Deputy Lentz testified the defendant "seemed to be resting comfortably in his bed. His head was slightly raised. He was very low-keyed. Seemed to know exactly where he was at and what was going on."

After informing Hanson of his *Miranda*[3] rights, and asking him whether he understood those rights, Hanson stated, "Yeah, I think so." One of the investigators asked Hanson further questions, including ascertaining that he had had *Miranda* rights read to him in the past. When asked whether he was willing to answer questions or make a statement, Hanson replied "sure." Hanson then signed a written *Miranda* waiver form, which informed him:

"1. You have the right to remain silent.

"2. Anything you say can and will be used against you in a court or other proceedings.

"3. You have the right to consult an attorney before making any statement or answering any question and to have an attorney present with you during questioning.

"4. If you cannot afford an attorney one will be appointed at public expense to represent you before or during any questioning, if you so wish.

"5. If you decide to answer questions now with or without an attorney, you have the right to stop the questioning and remain silent at any time you wish, and the right to ask for and have an

---

[3]*Miranda v. Arizona,* 384 U.S. 436 (1966).

attorney at any time you wish, including during the questioning."

Hanson informed them that he had borrowed the gun and car and went to the Kurschinsky farm in order to ask his wife about a canoe. He intended to frighten her with the gun, but she leaped forward and the gun went off. Hanson did not recall speaking to Mrs. Kurschinsky or shooting himself. He drove to the medical center when he felt a pain in his stomach.

Pursuant to a motion to suppress Hanson's statement, a hearing was held on July 27, 1984. The Honorable John E. Schneider presided at the suppression hearing and ruled that Attorney Durning was not Hanson's counsel at the time of the interrogation. He further found that the officers had no duty to tell Hanson that the public defender was available to speak to him. In regard to the voluntariness of Hanson's confession, the court found that: "[T]he statement was a voluntary statement of free and knowing intelligence. Mr Hanson knew what was going on. He chose to waive the rights he had, and it was a voluntary statement under all of the circumstances." According to the record, no one guarding Hanson ever told him that Attorney Durning was present at the medical center and had been appointed to represent him.

The court of appeals, in an unpublished decision, did not discuss the constitutional question presented, but stated that even assuming error, the admission of the statments was harmless error. The court of appeals found that under the circumstances, the statement was voluntary.

As a preliminary matter, this court is requested to determine the question of whether the state public defender could seek access to an individual in custody who had not been informed of his right to counsel and then appoint counsel for him when the authorities refused access to him. The trial court ruled that the state public defender acted inappropriately. The court of appeals did not discuss the question. We find it unnecessary to discuss the issue since it did not matter whether there was a private attorney asking to see the defendant or as here the public defender. The issue is determined by the fact that the defendant did not ask to see any attorney before or after receiving his *Miranda* rights. The public defender's authority to act for an individual is solely a statutory authority under sec. 977.05(4)(h) and (m), Stats., and is not triggered unless there is a request for legal assistance.[4] The state's characterization of Durning's appointment as ambulance chasing, or the public defender's justification of the appointment as an efficient exercise of authority and duty does not affect the resolution of this case.

Hanson requests that this court hold that law enforcement personnel violated his rights under Article I, sec. 8(1) of the Wisconsin Constitution by

---

[4]Sec. 977.05(4)(h) and (m), Stats., provides:

"(h)  Accept requests for legal services from indigent persons entitled to counsel under s. 967.06 or otherwise so entitled under the constitution or laws of the United States or this state and provide such persons with legal services when, in the discretion of the state public defender, such provision of legal services is appropriate. . . .

"(m)  Perform all other duties necessary or incidental to the performance of any duty enumerated in this chapter."

questioning Hanson without his "appointed" counsel's consent or presence and failing to inform Hanson that counsel was trying to see him.

The right to counsel prior to the initiation of adversary criminal proceedings "attaches as an incident to the Fifth Amendment privilege against self incrimination." *Jordan v. State,* 93 Wis. 2d 449, 462, 287 N.W.2d 509 (1980). To protect this privilege, the United States Supreme Court has imposed on the police an obligation to inform a suspect of his right to have counsel present at a custodial interrogation. *Miranda v. Arizona,* 384 U.S. 437, 468–71 (1966). The Fifth Amendment, however, does not require the police to advise the suspect of the immediate availability of a particular attorney. *Moran v. Burbine,* 106 S. Ct. 1135, 1144 (1986).

The facts of *Burbine* are similar to those in the instant case. While *Burbine* was in custody, his sister attempted to obtain legal assistance for him. Since *Burbine* had an appointment to see a particular public defender on a previous unrelated charge, his sister asked for that public defender. That particular public defender could not be reached. Another public defender in the same office contacted the police. That attorney informed the police that *Burbine* had an attorney from that office who was not available but that she would act as *Burbine's* legal counsel in the event that the police intended to place him in a lineup or question him. During a telephone call to the police station, an unidentified voice told her that the police would not be questioning *Burbine* or putting him in a lineup and that they were through with him for the night. The attorney was not informed, however, that officers of another police department were at the

station or that *Burbine* was a suspect in a murder. At the time *Burbine* was interviewed, he did not know that his sister was trying to retain counsel or that a public defender had actually volunteered representation.

Less than an hour after the attorney's telephone conversation with the police, *Burbine* was brought into an interrogation room and the police conducted the first of a series of interviews concerning the murder. Prior to each session, *Burbine* was informed of and waived his *Miranda* rights. *Burbine* eventually signed statements admitting to the murder.

In considering *Burbine's* request to suppress the statements the Supreme Court declared the purpose of *Miranda* warnings "is to dissipate the compulsion inherent in custodial interrogation and, in so doing, guard against abridgement of the suspect's fifth amendment rights." Also: "As is now well established, '[t]he ... *Miranda* warnings are "not themselves rights protected by the Constitution but [are] instead measures to insure that the [suspect's] right against compulsory self-incrimination [is] protected.'" ... Their objective is not to mold police conduct for its own sake. Nothing in the Constitution vests in us the authority to mandate a code of behavior for state officials wholly unconnected to any federal right of privilege." *Id.* at 1143.

The Supreme Court repeated in *Burbine* that "'[o]ne of the principal advantages' of *Miranda* is the ease and clarity of its application," quoting *Berkemer v. McCarty*, 468 U.S. 420, 430 (1984). *Id.* at 1143.

The court discussed the origin of *Miranda* requirements as a balancing between two competing concerns in custodial interrogations. The first concern

is "'the need for police questioning as a tool for effective enforcement of criminal laws' cannot be doubted. *Shneckloth v. Bustamonte*, 412 U.S. 218, 225, 93 S. Ct. 2041, 2046, 36 L. Ed. 2d 854 (1973)." The second competing interest is, "that the interrogation process is 'inherently coercive' and that, as a consequence, there exists a substantial risk that the police will inadvertently traverse the fine line between legitimate efforts to elicit admissions and constitutionally impermissible compulsion. *New York v. Quarles*, 467 U.S. at —, 104 S. Ct., at —." *Id.* at 1144.

In rejecting Burbine's claims that constitutionally the police were required to tell him of the availability of a particular attorney, the court reasoned:

> "Because, as *Miranda* holds, full comprehension of the rights to remain silent and request an attorney are sufficient to dispel whatever coercion is inherent in the interrogation process, a rule requiring the police to inform the suspect of an attorney's efforts to contact him would contribute to the protection of Fifth Amendment privilege only incidentally, if at all. This minimal benefit, however, would come at a substantial cost to society's legitimate and substantial interest in securing admissions of guilt." *Id.* at 1144.

The court also announced: "we are unwilling to expand the *Miranda* rules to require the police to keep the suspect abreast of the status of his legal representation." *Id.* at 1144.

The court also observed that the sixth amendment right to counsel does not attach until after the initiation of formal charges. *Id.* at 1146. *Burbine* argued that the right to non-interference in an attorney's dealings with a criminal suspect arises the

moment the relationship is formed, or, at the very least, once the defendant is placed in custodial interrogation. The Court rejected this position.

In *Burbine*, the court also determined that the police conduct did not deprive the defendant of the fundamental fairness guaranteed by the Due Process Clause of the fourteenth amendment. The court stated: "We do not question that on facts more egregious than those presented here police deception might rise to a level of a due process violation." However, the court qualified: "We hold only that, on these facts, the challenged conduct falls short of the kind of misbehavior that so shocks the sensibilities of civilized society as to warrant a federal intrusion into the criminal processes of the States." *Id.* at 1147–48.

However, in *Burbine* the court correctly noted:

> "Nothing we say today disables the States from adopting different requirements for the conduct of its employees and officials as a matter of state law. We hold only that the court of appeals erred in construing the Fifth Amendment to the Federal Constitution to require the exclusion of respondent's three confessions." *Id.* at 1145.

The state constitutional privilege against self-incrimination is worded virtually identically to its counterpart in the federal constitution. (Wisconsin Constitution, Art. I sec. 8 and United States Constitution Fifth Amendment.) Both guarantee that a person cannot be compelled in any criminal case to be a witness against himself.

We do not believe that the suspect's knowledge of the location of a particular counsel can affect the intelligent waiver of his constitutional rights as de-

211

scribed in *Miranda* warnings. Since the knowledge of the location of counsel adds no constitutional rights, does not alter the facts of the case as the suspect knows them, and does not give rise to any coercive influence by the police, such knowledge is not relevant to the suspect's voluntary decision to waive his rights. Although a suspect who was ready to waive his rights might change his mind when told an attorney was waiting to see him, the critical factor would be the convenience of seeing the attorney, not the intelligent perceived need for legal counsel. Since the convenience of the defendant is not constitutionally protected, the location of a particular attorney is not constitutionally required information.

If this information were required, distinctions between suspects would unfairly develop depending on whether third persons were able to engage the services of an attorney. A new area of law would develop regarding actions of police in particular fact situations, *i.e.*, was the attorney in the building, was the attorney on the telephone, was the attorney on his way to the building, was the attorney not immediately available but would be by a definite time, would a substitute attorney satisfy the requirement. Another line of cases could develop around who requested such representation: the accused's family, friends, or perhaps a criminal accomplice, or the attorney himself who has a reduced caseload. Would the police be required to inform the accused no matter who was seeking representation for the accused, even if such representation is sought out of the self-interest of the party seeking the representation?

An infinite number of circumstances could be envisioned only to create a new extension of the

exclusionary rule. The Supreme Court in *Burbine* found *Miranda* sufficient protection of the suspect's constitutional rights before interrogation and found no need to further extend the exclusionary rule. We believe *Burbine* to be a reasonable consideration of the limit to which *Miranda* will be extended and that the Wisconsin Constitution does not require greater protection. Since the right to counsel and the right to remain silent are given by the constitution to the defendant, he alone can exercise those rights. Neither his family nor his attorney are threatened with accusations, nor do they have the defendant's knowledge of the case, including the defendant's knowledge of his own guilt or innocence, nor are they subject to the pain of the defendant's possibly guilty conscience. Therefore, no one but the accused can make the decision to make a statement to the police or to ask for the assistance of counsel in making his decision. Since both the rights and the person the rights are granted to, the accused, are the same under both the federal and Wisconsin Constitutions, there is no logical reason to find that someone other than the accused could exercise those rights under the Wisconsin Constitution.

The trial court in this case found the defendant's statements voluntary. On review an appellate court will overturn factual findings on the question of voluntariness only if they are against the great weight and clear preponderance of the evidence. *State v. Verhasselt*, 83 Wis. 2d 647, 653, 266 N.W.2d 342 (1978). Credibility is a matter for the trier of fact. *Norwood v. State*, 74 Wis. 2d 343, 363, 246 N.W.2d 801 (1976). Any conflicts in testimony are resolved in favor of the trial court's findings. *Verhasselt*, 83 Wis. 2d at 653. But an

appellate court is not bound by the lower court's determination of the ultimate issue, which is essentially a conclusion of law. *State v. Clappes*, 117 Wis. 2d 277, 281, 344 N.W.2d 141 (1984). Whether a confession is considered voluntary is a constitutional fact and is entitled to the same review as a conclusion of law.

Hanson claims that when the police did not tell him that an attorney wanted to see him, he was "held incommunicado." He claims that since he was held incommunicado, his confession was not voluntary and his waiver was not informed. The defendant was not held incommunicado by the authorities. Upon arriving at the emergency room of the Lakeview Medical Center after shooting himself in the stomach, the defendant was in surgery and then in the recovery room. He was under constant medical attention and was in and out of consciousness. During the times he was awake, he carried on conversations with doctors and nurses. Hanson's parents were not permitted to visit since he did not want to confront them and asked the hospital staff to keep them away.

On May 10, the day after his surgery and arrest, at about 9:30 a.m., the police determined from hospital personnel that the defendant was coherent and capable of communicating with them. Tom Peterson, the Director of Nursing at the Lakeview Medical Center, checked with Nurse Judy Fischer before reporting to the police that the defendant was coherent. Hanson said he understood his rights and was willing to make a statement without consulting an attorney. No threats, promises, or physical abuse by the police are claimed to have been used to compel the defendant to submit to interrogation in the absence of an attorney.

He was then 29 years old and had completed the eleventh grade in school.

Although failure to advise a suspect of the immediate availability of a particular attorney might arguably affect the intelligence of defendant's decision to dispense with counsel, it is impossible to imagine how this omission would affect the voluntariness of his statement. Facts about which the defendant has no knowledge can hardly exert any degree of coercion on him. *Burbine* stated at 106 S. Ct. 1141: "Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." The defendant's voluntary decision to give a statement had no reasonable nexus or relationship with the attorney's presence in the hospital, as Hanson did not know of that presence.

■ Hanson was obviously in pain as a result of the gunshot wound and surgery; however, a statement is not rendered involuntary merely because a suspect is suffering from physical injuries and the resulting discomfort at the time it was made. In cases decided this same date, we expanded upon suffering from physical injuries and its effect on voluntariness. *State v. Clappes,* 136 Wis. 2d 222, 401 N.W.2d 759 (1987), and *State v. Osman,* 136 Wis. 2d 222, 401 N.W.2d 759 (1987). *See also: People v. Rhodes,* 119 Ill. App. 3d 100, 457 N.E.2d 1300, 1307 (1983); *State v. Williford,* 275 N.C. 575, 169 S.E.2d 851, 855 (1969); *State v. Wise,* 19 N.J. 59, 115 A.2d 62, 80 (1955). *See State v. Nash,* 123 Wis. 2d 154, 167, 366 N.W.2d 146 (Ct. App. 1984). *Cf. State v. Parker,* 55 Wis. 2d 131, 139, 197 N.W.2d 742 (1972).

Pain can affect the voluntariness of a statement under some circumstances, such as when it is so severe that it limits the suspect's ability to think rationally or when relief from it is conditional on making of a statement. *See State v. Nash*, 123 Wis. 2d at 167. There is no credible evidence in this record that Hanson's pain affected his rational faculties. Both the hospital personnel who observed him and the deputies who questioned him agreed to the contrary, that Hanson was completely coherent at the time he made his statement. Hanson testified he could not recall any of his conversation with the deputies because he was "not thinking straight" when he spoke with them. The trial court specifically found this testimony incredible, however, and chose to believe the witnesses who said that Hanson was coherent.

One of the deputies speculated that Hanson was suffering mental stress as a result of shooting his wife. The fifth amendment is not concerned, however, "with moral and psychological pressures to confess emanating from sources other than official coercion." *Oregon v. Elstad*, 105 S. Ct. 1285, 1291 (1985). There is no evidence in this case that the defendant's physical condition had any effect on his state of mind being voluntary in making statements to the police. Nor is there any evidence that the ten milligrams of morphine given Hanson approximately eighty minutes before the interrogation began had any effect on the voluntariness of his waiver or statement. Hanson testified that the analgesic, in fact, made it "a lot easier to think."

The record supports the factual findings of the circuit court, and based on those findings, we rule that under the totality of the circumstances, Hanson's

statement was voluntary beyond a reasonable doubt. *Norwood v. State*, 74 Wis. 2d 343, 363–64, 246 N.W.2d 801 (1976).

We agree with the United States Supreme Court that an event occurring outside the presence of the defendant and entirely unknown to him can have no bearing on his capacity to comprehend and knowingly relinquish a constitutional right. *Burbine* 106 S. Ct. at 1141. We hold, in addition, that the Wisconsin Constitution does not require the police "to keep the suspect abreast of the status of his legal representation" when he has not requested such representation. *Id.* at 1144.

This court stated in *Hover v. State*, 180 Wis. 407, 411, 192 N.W. 89 (1923) "Sec. 8 [Art. I of the Wisconsin Constitution] corresponds in substance with art. V and sec. 11 is identical with art. IV respectively, of the amendments to the United States constitution." This court in *Hoyer* squarely aligned itself with the rulings of the United States Supreme Court. *Id.* at 415. We see no reason to deviate from that legal position in this case. If and when the United States Supreme Court interprets the federal constitution as granting lesser rights than this court believes are extended to persons under the Wisconsin Constitution, we will so hold; however, the rule sought in this case is not one of those.

Section 967.06, Stats., is a statement of the legislature that "as soon as practicable after a person has been detained or arrested in connection with any offense which is punishable by incarceration ... the person shall be informed of his or her right to counsel." The words "as soon as practicable" are not defined and require a case-by-case analysis. In the instant case, the defendant came to the attention of

the police after arriving at the hospital with a gun wound to the abdomen. He received surgical treatment that same day. It appears his freedom was not available to him, even if he could have physically exercised it, after he was placed by medical authorities in a private hospital room. From that time on he was guarded by the police for his own protection and to assure that he would not leave the hospital. The record is clear that the defendant was not in condition to receive advice that he was entitled to counsel under sec. 967.06 until the authorities had verified he was coherent with the hospital persons. It was then that he was advised of his right to an attorney as a part of the *Miranda* warnings before interrogation.

A statute should not be construed to reach an absurd result. *State v. Disch*, 129 Wis. 2d 225, 233, 385 N.W.2d 140 (1986). To construe "as soon as practicable" to mean that the police should read *Miranda* rights to a suspect clearly unable to understand them when the police have no intent of conducting an interrogation would clearly be absurd.

It is significant that the defendant argues that his statements were not voluntary due to his confused state of mind, physical condition and drug influence and yet claims that it was "as soon as practicable" to advise him under sec. 967.06, Stats., of his right to counsel at a time before the *Miranda* warnings were given. As soon as practicable must mean at a time when the person detained is able to comprehend his right to counsel. Defendant states that did not even occur by the time of the *Miranda* rights were given him. In fact, the defendant testified he did not remember events in the hospital on May 9. Section 967.06 was not violated by the Barron county authorities.

Lastly, Hanson argues that the police "deceived him by omission." The police practiced no deception because they made no statements whatsoever regarding the presence or absence of counsel, and Hanson neither asked for the counsel nor asked if one was nearby. Since the presence of available counsel was not relevant to the exercise of Hanson's waiver, the police had no duty to inform Hanson about the lawyer. In the absence of a duty to inform, there can be no deception by omission.

The conduct of the police did not violate the United States or Wisconsin constitutional provisions protecting against self-incrimination, nor the defendant's right to counsel, due process nor sec. 967.06, Stats.

*By the Court.*—The decision of the court of appeals is affirmed.

SHIRLEY S. ABRAHAMSON, J. (*dissenting*). This case presents the following fact situation: Your adult son is injured, hospitalized and under arrest for allegedly committing a serious crime. You hire a lawyer who has previously represented your son. The lawyer goes to the police and advises them that she is your son's attorney, that she wants to consult with your son and that your son is not to be questioned unless she is present.

In Wisconsin your son has a right to be taken promptly before a judge after arrest; he gets additional rights once the judicial process is initiated. Your son, however, is not taken before a judge as promptly as possible. Instead, the police use the day to question your son and get a confession.

In Wisconsin your son has a right—protected by the federal and state constitutions and the Wisconsin statutes—to be represented by counsel during police questioning. The police carefully and correctly advise your son that he has the right to a lawyer and that if he wants a lawyer one will be appointed for him at public expense to represent him before or during questioning. But the police do not tell your son that a lawyer whom you have hired is immediately available to speak with him. Your son is given no opportunity to accept or reject assistance from counsel hired for him. Indeed, the police deliberately keep the lawyer away from your son and question him, even after assuring the lawyer that they will not question him. Your son makes a statement.

The action the police take to prevent your son from knowing that his parents had hired a lawyer for him had only one possible motivation: to dissuade your son from exercising his constitutional right to speak with a lawyer.

The United States Supreme Court has said it will not intrude into the criminal processes of the state to condemn this kind of police conduct as a matter of federal law. The Court has declared that each state may adopt its own requirements for the conduct of its employees and officials as a matter of state law. *Moran v. Burbine*, 106 S. Ct. 1135, 1145 (1986). By not imposing a federal constitutional requirement on the states and by encouraging the states to adopt their own rules governing police conduct, the United States Supreme Court recognizes the importance of the state courts in protecting individual rights and societal interests in our federal system. *Id.* at 1148.

The majority struggles to show that the police conduct in this case fits within the letter of the law

which entitles an accused to be represented during police questioning. But it is clear that the police conduct violates the spirit of the law. It is with good reason that the Wisconsin Constitution exhorts us that "the blessings of a free government can only be maintained by a firm adherence to justice ... and by frequent recurrence to fundamental principles." Art. I, sec. 22.

While I am aware of and give due weight to the needs of law enforcement officers and the weighty social objectives of crime investigation, I conclude that this court demeans the defendant's statutory and constitutional rights to consult with an attorney by giving its seal of approval to conduct that kept an accused from seeing a lawyer his family retained for him. I would suppress the confession.